UNITED STATES of America For the Use of R. Rudnick and Company, an Illinois corporation,

v.

DANIEL, URBAHN, SEELYE AND FULLER, a partnership, et al.,

No. 72 C 312.

United States District Court, N. D. Illinois, E. D.

April 12, 1973.

John M. Burke, Chicago, Ill., for plaintiff.

James R. Thompson, U. S. Atty., by R. B. Schaeffer, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION and ORDER

AUSTIN, District Judge.

Plaintiff, a corporation engaged in the general construction business, brought this suit under the Miller Act, 40 U.S.C. § 270a et seq. There are four defendants, one a partnership, Daniel, Urbahn, Seelye and Fuller (hereinafter referred to as "DUSAF"), alleged to be composed of the other defendants, which are another partnership and two corporations. The complaint has previously been dismissed as to five other defendants and two others were granted summary judgment.

The complaint alleges that DUSAF was the prime contractor for the United States and the Atomic Energy Commission (AEC) for the construction of proton beam enclosures at Batavia, Illinois.[1] Prior to submitting its bid, plaintiff examined the construction site and soil boring reports that were prepared by Soil Testing Services, Inc., (a previously dismissed defendant) and that were submitted by DUSAF in its "Invitation to Bid." Plaintiff alleges that based on its inspections and the soil boring reports it believed it would not encounter any unusual water conditions and determined the amount of its bid for the construction work accordingly. Its bid was accepted by DUSAF and after beginning performance plaintiff encountered an "unusual" amount of subsurface water, alleged to be an "unknown latent physical condition differing materially from those conditions usually encountered in work of this nature."

1. While the complaint alleges that DUSAF was the prime contractor, from copies of contracts submitted to this court it appears that DUSAF was actually a subcontractor under Universities Research Association, Inc. (URA) the prime contractor. In regard to the pending motions DUSAF has intentionally failed to deny it is the prime contractor and therefore this court will have to assume that it is.

Plaintiff alleges that this condition falls within the provisions of two clauses of its contract with DUSAF that provide for an "equitable adjustment" of the contract by DUSAF; that it had increased costs of $497,559 as a result of the condition; that it demanded payment pursuant to the two contract clauses; and that DUSAF has refused to pay the additional costs.

Pending before the court are two motions, plaintiff's motion to strike the appearance of the U. S. Attorney and DUSAF's motion, filed by the U. S. Attorney, to dismiss or in the alternative, for summary judgment.

### Motion to Strike the Appearance of the U. S. Attorney

■ In the court file is a copy of a letter from the Assistant United States Attorney General, Civil Division, which acknowledges receipt of a letter from the AEC that presumably asked the government to take part in this lawsuit. In that letter the Assistant Attorney General told the AEC that he was asking the U. S. Attorney in Chicago to undertake the defense of this case. The U. S. Attorney filed, on behalf of DUSAF, the aforementioned motion to dismiss or for summary judgment. He did not, however, file an appearance on behalf of DUSAF, as he is required to do under Local Civil Rule 6(b). Given the present posture of the case, the U. S. Attorney's filing a motion on behalf of DUSAF will be considered as equivalent to filing an appearance and therefore plaintiff's motion to strike the appearance is appropriate.

■ Plaintiff's contention is, in short, that because Miller Act suits are brought in the name of the United States, for the use of subcontractors, and because the purpose of the Act is to bestow a benefit upon subcontractors, it is inappropriate for the U. S. Attorney to represent a defendant contractor. The U. S. Attorney argues that because the contract between the AEC and DUSAF is a cost-plus-fixed-fee contract (CPFF),[2] under which the AEC will have to pay all of DUSAF's costs, the government has an interest in this case and under 28 U.S.C. §§ 516, 547 his appearance is proper.

The issue of the propriety of the government appearing on behalf of a defendant contractor in a Miller Act case is apparently one of first impression.[3] Therefore, it is important to determine the intent of Congress in passing the Miller Act and the statutes enumerating the duties of U. S. Attorneys.

### Duties of the U. S. Attorney

The U. S. Attorney relies upon 28 U.S.C. §§ 516 and 547 as giving him authority to represent the government's interest in this case, which means appearing on behalf of the contractor DUSAF. Section 547 provides in relevant part:

> Except as otherwise provided by law, each United States attorney, within his district shall . . . prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned. . . .

Section 516 provides:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is re-

---

2. Under this type of contract the subcontractor is reimbursed for allowable costs of actual performance plus a fee which is determined at the beginning of the work. Nash, Pricing Policies in Government Contracts, 29 Law & Contemp.Prob. 361, 365 n. 13 (1964).

3. Although not brought under the Miller Act, People ex rel. Kerner v. Keeney, 399 Ill. 611, 78 N.E.2d 252 (1948), involved the U.S. Attorney representing the defendant contractor who had a CPFF contract with the War Department. The court held that the trial judge may refuse the appearance of the U.S. Attorney "only when all of the facts are known to him and no reasonable doubt exists but that the United States has no direct interest in the outcome of the litigation." 399 Ill. at 616, 78 N.E.2d at 254.

served to officers of the Department of Justice, under the direction of the Attorney General.

While on their faces these statutes might seem to grant the U. S. Attorney such authority, an examination of the legislative history makes their scope less clear.

Since § 547 is more clearly applicable to the instant case than § 516, its background will be examined first. The Judiciary Act of 1789 provided that a person should be appointed in each judicial district to

> act as attorney for the United States . . . whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned. . . .

Act of Sept. 25, 1789, ch. 20, § 35, 1 Stat. 92. While on its face it would seem to provide that the district attorney (as he was known until 1948) would only *prosecute* criminal and civil actions, he in fact had much discretion in defending cases in which the government was concerned.[4] In 1863 Congress provided that it was the attorneys' duty to appear on behalf of all revenue officers, Act of Mar. 3, 1863, ch. 76, § 13, 12 Stat. 741 [now 28 U.S.C. § 547(3)], although earlier it had provided for payment to them when they defended *any* officers of the United States for acts

done in the "lawful discharge of their duties." Act of Aug. 16, 1856, ch. 124, § 12, 11 Stat. 50.[5] The Supreme Court sanctioned district attorneys defending cases by interpreting the words "to prosecute all civil actions" as

> covering any case in which the district attorneys are employed to prosecute the interests of the government in any civil action, whether such interest be the subject of attack or of defense.[6]

Thus, while the statute prescribing the duties of district attorneys in defending cases may have appeared to be limited in scope, it was not so interpreted by the courts and the Attorney General.

The provision covering duties, which consisted of the original language of 1789 plus the 1863 addition covering defense of revenue officers, remained unchanged until 1948. [See 28 U.S.C. § 485 (1940)]. In that year Title 28 was revised, the purpose thereof being to create a "modern, workable" judicial code. 93 Cong.Rec. 8384 (1947) (Remarks of Representative Robison). The revision specificially denominated the attorney as the United States Attorney and in 28 U.S.C. § 507(a) (Supp. IV, 1950) [6a] provided;

> (a) It shall be the duty of each United States attorney, within his district, to:
>
> . . . . . .
>
> (2) Prosecute or defend, for the government, all civil actions, suits

---

4. The *Attorney General interpreted the* statute as requiring district attorneys to "appear in the federal courts of their respective districts in *all* cases in which the 'United States shall be concerned.'" 8 Op.Attn'y Gen. 399 (1857) (emphasis added).

5. The Attorney General, noting that the law was "silent" as to the defense of officers other than those connected with *the revenue,* admitted that *"it is every* day's practice for district attorneys to defend them; and the same may be said in reference to cases in which the United States is interested but not a party to the record." 20 Op.Attn'y Gen. 235 (1891).

6. United States v. Smith, 158 U.S. 346, 354, 15 S.Ct. 846, 849, 39 L.Ed. 1011 (1895) ; *accord,* Colman v. United States, 66 F. 695, 699 (7th Cir. 1895). This interpretation was upheld even when put to the very persuasive argument of a district attorney that when the original statute was passed in 1789 the United States could not be sued in the district or circuit courts and therefore it was not contemplated that a district attorney *would be called upon to defend the United* States. Hilborn v. United States, 163 U.S. 342, 345, 16 S.Ct. 1017, 41 L.Ed. 183 (1896).

6a. Act of May 24, 1949, ch. 139, § 71, 63 Stat. 100.

or proceedings in which the United States is concerned. . . .

Significantly, subsection (a)(2) contained the first statutory authorization for the U. S. Attorney to defend all civil actions in which the government was concerned. Presumably the revisers intended that the wording of the revision reflect the broad interpretation of the U. S. Attorney's duties by the courts and the Attorney General, yet there is no indication of that in either the Reviser's Notes, which accompanied the House Report, or the debate in Congress. The Reviser's Notes stated that the revision of the U. S. Attorney's duties merely changed the "arrangement and phraseology" and was a "consolidation" of prior law. H.R.Rpt. No. 308, 80th Cong., 1st Sess. A 60, 61 (1947), reprinted at 28 U.S.C.A. § 547 (1968). The only debate in Congress on the revision concerned the creation of the Tax Court. 93 Cong.Rec. 5049–50, 8384–92 (1947); 94 Cong.Rec. 7927–30, 8498–501 (1948).

In 1949 Congress amended various parts of the revision in order to "correct minor typographical and clerical errors. . . ." 95 Cong.Rec. 5826 (1949) (Remarks of Senator O'Conor). Those involved in the revision may have realized that the U. S. Attorney's duties enumerated in the revision did not conform to the prior statutory law, because one of the amendments changed the first part of 28 U.S.C. § 507(a), which had read "It shall be the duty of each United States attorney. . . ." It was amended to read, "Except as otherwise provided by law, it shall be the duty of each United States attorney. . . ." Act of May 24, 1949, ch. 139, § 71, 63 Stat. 100. One of the purposes of the 1949 amendments was to clarify

"the language of some sections to conform more closely to the original law, or to remove ambiguities"

that had been discovered. H.R.Rpt. No. 352, 81st Cong. 1st Sess. 1 . (1949). While neither the House Report nor floor debate [7] indicates the reason Congress made that particular amendment, it is not unreasonable to assume that "Except as otherwise provided by law" was added to conform the revision more closely to the original law.

Thus, while courts, when faced with the question, have liberally construed the duties of U. S. Attorneys in appearing in cases in which the United States is "concerned," [8] there is not much evidence that Congress intended to give them unlimited discretion to appear in any and all cases.

■■ A similar conclusion is reached when the background of the other provision upon which the U. S. Attorney relies, 28 U.S.C. § 516, is examined. That section, quoted in full above, provides that the conduct of litigation in which the United States is "interested" is reserved to the Department of Justice. That section was enacted in 1966 and was derived from 5 U.S.C. § 306 (1964), which was limited in scope to proceedings only in the Supreme Court and the Court of Claims and which provided, in relevant part:

The officers of the Department of Justice, under the direction of the Attorney General, shall . . . procure the proper evidence for, and conduct, prosecute, or defend all suits and proceedings in the Supreme Court and in the Court of Claims, in which the United States, or any officer thereof, as such officer, is a party or may be interested. . . .

---

7. 95 Cong.Rec. 3813–20, 5826, 6283–84 (1949).

8. Carter v. American Export Isbrandtsen Lines, Inc., 411 F.2d 1185 (2d Cir. 1969) (U.S. Attorney allowed to defend the lessee of a ship owned by the United

States); United States for Use of Somers v. Winscott, 238 F.2d 519 (7th Cir. 1956) (U.S. Attorney allowed to appear on behalf of the clerk and a deputy clerk of the district court who were sued in regard to an alleged erroneous order.)

The purpose of the 1966 Act was to restate in comprehensive form, without substantive change, the statutes in effect before July 1, 1965, that relate to Government employees, the organization and powers of Federal agencies generally, and administrative procedure, and to enact title 5 of the United States Code.

H.R.Rpt. No. 901, 89th Cong., 1st Sess. 1 (1965). The change was to merely rearrange the then existing law and the Senate Committee on the Judiciary rejected proposed amendments when they believed they "constituted a substantive change in existing law which is not within the concept of a codification." 112 Cong.Rec. 17010 (1966). In light of these intentions of Congress in passing this codification, § 516 should be strictly construed. That provision does not explicitly provide that officers of the Department of Justice may conduct any litigation in which they believe the government has any interest; it merely provides that if any is conducted, it shall be done by the Department of Justice.[9]

Thus, the legislative history of 28 U. S.C. §§ 516 and 547 lend little support to the contention that the U. S. Attorney and the Department of Justice have discretion to defend any civil action in which they think the government might be interested. In light of this vague legislative history this court believes interpretation of those statutes must be made in light of the Miller Act. Although as previously noted, there is no reported case in point, the issue arises more than infrequently. The U. S. Attorney has filed with this court excerpts from the United States Attorneys' Manual (U.S. Department of Justice, June 1, 1970), which states that "frequently" the Department of Justice is asked to defend cost-plus contractors and in those cases

it is in the interest of the Government to furnish legal representation for the

contractor upon the request of the interested Government agency (most frequently the Departments of the Army, Navy, or Air Force, or the Atomic Energy Commission).

### Miller Act and its Background

The predecessor of the Miller Act was the Heard Act. Act of Aug. 13, 1894, ch. 280, 28 Stat. 278. The reason for passage of the Heard Act was that many contractors constructing public buildings for the government were insolvent when entering into the contracts or at the completion of the work and because mechanics' and materialmen's liens were not provided for on public buildings, persons furnishing labor or material to the contractors were left without a remedy. The practice prior to the Act had been for the government to require contractors to post a bond for the protection of the United States and the law was passed to give those furnishing material and labor the right to sue on the bond. H.R.Rpt. No. 97, 53d Cong., 1st Sess. 1 (1893). Contractors were obligated to "promptly make payments" to those supplying material and labor and if they did not the latter were authorized to bring suit "in the name of the United States for his or their use and benefit. . . ."

The Heard Act was amended in order to specify the procedure to be followed by those furnishing labor or materials to contractors (hereinafter referred to as subcontractors). Act of Feb. 24, 1905, ch. 778, 33 Stat. 811. They were given the right to "intervene and be made a party" in an action instituted by the government, though the government's interest had a priority over theirs. If the government instituted no action, six months after the "completion and final settlement" of the contract with the government, subcontractors could bring suit against the contractor. The suit had to be commenced within one year after

9. See S & E Contractors, Inc. v. United States, 406 U.S. 1, 12–15, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972) (where § 516 was interpreted in light of the Wunderlich Act

and the court held the Department of Justice had no right to appeal from a decision of the AEC).

such completion; thus subcontractors had a six month period in which they could sue.

The Heard Act was repealed by the Miller Act. 40 U.S.C. § 270a et seq., Act of Aug. 24, 1935, ch. 642, 49 Stat. 793. As previously noted, under the Heard Act subcontractors had to wait until six months after completion of all construction before they could sue, which on lengthy projects was often long after they had supplied labor and material. It was the "resultant hardships" caused by this delay that the Miller Act sought to prevent. H.R.Rpt. No. 1263, 74th Cong. 1st Sess. 1 (1935). One of the hardships was that subcontractors were often forced to accept compromises of their claims:

> [I]t appears that claimants frequently find themselves under the necessity of choosing whether they will wait for years for their money or accept compromises which, if they do not involve greater loss, at least destroy the profitableness of the contract. Those in financial stringency, of course, have no choice but the latter alternative.

H.R.Rpt. No. 1263, 74th Cong., 1st Sess. 2 (1935). Also, bad faith on the part of contractors, already noted as one of the reasons for passage of the Heard Act, was still a problem. Senator Walsh stated,

> the investigations conducted by the subcommittee of the Committee on Education and Labor showed a deplorable condition with reference to the way employees on public buildings were defrauded and cheated of their wages, and any measure that will tend to strengthen their rights and help them to secure their compensation is justified.

79 Cong.Rec. 13383 (1935).

The significant changes in procedure created by the Miller Act were that its provisions applied to contracts exceeding $2,000; a contractor had to provide two bonds instead of the previous one, one a performance bond for the benefit of the government and the other a payment bond for the benefit of subcontractors; and instead of having to wait until six months after completion and final settlement of the contractor's contract with the government, subcontractors could sue 90 days after the last day on which they supplied labor or material. The provision of the Heard Act that suit could not be commenced after the expiration of one year after the date of final settlement was retained.

Plaintiff's arguments are that the U. S. Attorney's appearance is improper because the purpose of the act is to protect subcontractors, because the lawsuit is brought in the name of the United States, and because allowing him to appear would set a precedent enabling general contractors to deny claims brought on behalf of subcontractors knowing that the government will defend them at the cost of the taxpayers.

■ Plaintiff is well founded in arguing that the purpose of the act is to protect subcontractors. In interpreting the Heard Act, the Supreme Court said it was

> committed to the doctrine that it should be liberally construed in aid of the evident public object—security to those who contribute labor or material for public works.

Standard Accident Insurance Co. v. United States for Use and Benefit of Powell, 302 U.S. 442, 444, 58 S.Ct. 314, 315, 82 L.Ed. 350 (1938).

Further, Congress in passing the Heard Act evidenced a concern that the government incur no expense in suits by subcontractors against contractors. The statute explicitly provided that "such action and its prosecutions shall involve the United States in no expense." Act of Aug. 13, 1894, ch. 280, 28 Stat. 278. The Miller Act retained the provision that "[t]he United States shall not be liable for the payment of any costs or expenses of any such suit." 40 U.S.C. §

270b(b). Moreover, the time period for suing after the work was completed by subcontractors was shortened so that they would not have to compromise their claims for fear of having to wait a long time to collect their money by suit. H. R.Rpt. No. 1263, 77th Cong., 1st Sess. 2 (1935).

If, because of the CPFF contract, contractors can always count on the government defending them in a lawsuit or at least paying expenses, then they have no incentive to make an equitable compromise of a subcontractor's claim.[10] Also, subcontractors, knowing that they would have to pay litigation expenses while contractors would not, would probably feel pressure to settle their claims for less than they might otherwise.

What complicates the issue is that at the time the Miller Act was passed almost all government construction was based on fixed price contracts rather than CPFF contracts. S.Rpt. No. 366, 84th Cong., 1st Sess. 2 (1955). As a result, the provision that the government not be liable for costs of the suit, 40 U. S.C. § 270b(b), makes little sense today when the government contractually agrees to bear the burden of the contractor's litigation expenses.[11] The plaintiff has not named as a defendant the AEC or otherwise challenged the validity of that contractual obligation undertaken by the AEC. Since that obligation has not been challenged this court must assume its validity and in light of that plaintiff's argument has little merit. Given the government's contractual obligation to pay litigation expenses, it would probably make little difference to a contractor whether he hires his own

counsel or the U. S. Attorney appears for him. Either way, the government ends up paying the cost and either way there is no incentive for him to settle prior to litigation. The only real effect of not allowing the U. S. Attorney to appear probably would be to increase the ultimate cost to the taxpayers by having to pay the cost of private counsel rather than the cost of a government attorney.

██ This court does not feel it is in the position to, and plaintiff has not argued it should, find illegal the government's practice of letting CPFF contracts that cover litigation expenses, in spite of its apparent inconsistency with the Miller Act provision that the government incur no expenses or costs. Even though the legislative history of the statutes enumerating the U. S. Attorney's duties is vague, sometimes the court's task is not to "inquire what the legislature meant [but to] ask only what the statute means."[12] Given the long history of courts allowing U. S. Attorneys to appear in cases in which there is a clear governmental interest and given the AEC's contractual obligation to reimburse URA, which in turn will reimburse DUSAF, here unchallenged by plaintiff, this court finds there is a sufficient governmental interest to allow the appearance of the U. S. Attorney on behalf of DUSAF.

*Motion to Dismiss or for Summary Judgment*

The contract between plaintiff and DUSAF has a disputes clause that provides in part:

A. Except as otherwise provided in this Subcontract, any dispute con-

---

10. Another problem with CPFF contracts is "to greatly reduce the incentive to the contractor to utilize resources efficiently in the performance of the job." Accordingly, the Department of Defense has in the past tried to reduce the use of CPFF contracts. Nash, Pricing Policies in Government Contracts, 29 Law &. Contemp.Prob. 361, 365–366 (1964).

11. The language of the contract between URA and the AEC is identical to that of the subcontract between DUSAF and

URA in regard to litigation expenses. Both contracts provide that litigation expenses including reasonable counsel fees are reimbursable by URA and, in turn, by the AEC. Both the subcontract and the contract provide that in the event the government defends a lawsuit, DUSAF and URA, respectively, shall assist in asserting a defense.

12. Holmes, The Theory of Legal Interpretation, 12 Harv.L.Rev. 417, 419 (1899).

cerning a question of fact arising under this Subcontract which is not disposed of by agreement shall be decided by the Manager, Chicago Operations Office, Atomic Energy Commission, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Subcontractor. The decision of the Manager, Chicago Operations Office shall be final and conclusive unless within thirty (30) days from the date of receipt of such copy, the Subcontractor mails or otherwise furnishes to the Manager, Chicago Operations Office a written appeal addressed to the Commission, providing a copy to the Contractor. The decision of Commission or its duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. . . .

B. This 'Disputes' Article does not preclude consideration of law questions in connection with decisions provided for in Section A above: Provided, that nothing in this Subcontract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.[13]

The U. S. Attorney, on behalf of DUSAF, has moved to dismiss or in the alternative for summary judgment on the ground that by agreeing to the disputes clause plaintiff has waived its rights to sue under the Miller Act. Plaintiff contends that such a waiver must be explicit and that the language of the disputes clause is not sufficiently explicit.

In Fanderlick-Locke Co. v. United States, 285 F.2d 939 (10th Cir. 1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961), the court interpreted a subcontract provision that provided the subcontractor would be bound to the contract in the same manner as the contractor was bound to the government. The prime contract, but not the subcontract, contained a disputes clause similar to the one here in question. While expressing "no opinion as to the right of the parties to enter into an agreement which might circumvent the Miller Act," the court held that the parties had not intended that the subcontractor be required to comply with the disputes clause of the prime contract before it could maintain an action under the Miller Act. 285 F.2d at 942; accord, United States for Use of B's Co. v. Cleveland Electric Co., 373 F.2d 585 (4th Cir. 1970). The instant case is clearly distinguishable in that the disputes clause is explicitly set out in the subcontract itself, not incorporated therein by reference to the prime contract.

This court finds, however, that plaintiff has not waived all of its Miller Act rights and therefore DUSAF's motion must be denied. The Heard and Miller Acts were intended to protect subcontractors against insolvent or unethical contractors. While there is no allegation that DUSAF is presently insolvent, it might have financial problems in the future. By then it might be too late for plaintiff to file suit.[14] Filing within the one year period is a con-

---

13. This provision is identical to the one in the subcontract between DUSAF and URA and the one in the contract between URA and the AEC.

14. Some contractors have been known to stall as long as possible in making payments to subcontractors. When that occurs, a subcontractor may be forced to file suit. Easterwood, Miller Act Problems, 16 Fed.Bar J. 264, 267–268 (1956).

dition precedent to the right to maintain suit. United States for Use and Benefit of Statham Instruments, Inc. v. Western Casualty and Surety Co., 359 F.2d 521 (6th Cir. 1966); United States ex rel. Dover Elevator Co. v. General Insurance Co., 339 F.2d 194 (6th Cir. 1964). Not even arbitration will toll that requirement. United States for Use of Wrecking Corp. v. Edward R. Marden Corp., 406 F.2d 525 (1st Cir. 1969). If a subcontractor fails to file suit within one year after he has completed his work or delivered his supplies, he loses all his Miller Act rights. That includes his right to proceed against an insolvent contractor, and there is no allegation by DUSAF that plaintiff has waived that right.

Moreover, it is not clear that the issue in this case does not involve a question of law, which would be subject to court review. *See, e. g.*, United States for Use of White Masonry, Inc. v. F. D. Rich Co., Inc., 434 F.2d 855 (9th Cir. 1970).

While plaintiff is not barred from filing this suit, it is barred from proceeding further until it exhausts its administrative remedies. It explicitly agreed to follow those procedures and it cannot now claim that it is not obligated to do so. At this point in the lawsuit it does not appear that requiring it to do so would be contrary to the purposes of the Miller Act.

Thus, this court finds that plaintiff has not waived all its Miller Act rights and therefore this proceeding will be stayed pending the outcome of the disputes clause proceeding. Thereafter DUSAF may renew its motion to dismiss or for summary judgment if it believes plaintiff has no remaining Miller Act rights.

Plaintiff's motion to strike the appearance of the U. S. Attorney is denied. DUSAF's motion to dismiss or for summary judgment is denied. Further proceedings in this case are stayed pending the resolution of the disputes clause proceeding before the AEC.