**UNITED STATES of America,**
**Plaintiff,**

v.

**BRAND JEWELERS, INC., et al.,**
**Defendants.**

**No. 70 Civ. 179.**

United States District Court,
S. D. New York.

Oct. 8, 1970.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of N. Y., for the U. S.; David Paget, David M. Brodsky, Asst. U. S. Attys., of counsel.

John S. Martin, Jr., New York City, for defendants Brand Jewelers, Inc. and Howard Star.

Thomas D. Edwards, New York City, for defendant Sol H. Erstein.

FRANKEL, District Judge.

The interesting question before the court is whether the United States has "standing" as a plaintiff to seek injunctive and other civil remedies for an allegedly "long-standing and systematic practice" of obtaining default judgments against economically disadvantaged defendants by means of the technique known with apt inelegance as "sewer service." The question arises upon a motion to dismiss under Fed.R.Civ.P. 12(b), so it is well to stress at the outset that we deal only with allegations, by no means established "facts," but we are

to assume for present purposes that the things alleged are true.

## I.

Invoking the court's jurisdiction under 28 U.S.C. § 1345,[1] the Government brings this action against Brand Jewelers, Inc., a retail seller of watches, jewelry and other consumer goods; Brand's president and sole stockholder, Howard Star; its attorney, Sol H. Erstein; and two corporations and 15 individuals, styled "the process serving defendants" (including the officers of the corporate service agencies, notaries public who participate in proving service and individuals employed in the physical business of serving process). The charges in the complaint may be summarized as follows:

Brand Jewelers sells its wares through salesmen who solicit "door-to-door, on the street and at factories and other places of work." Sales are "on easy credit terms, with little or no down payment" and small installment payments over months or years. The purchasers generally "are poor and are members of economically and culturally deprived minority groups residing in slum or ghetto areas * * *."

Each year Brand Jewelers files in the Civil Court of New York City thousands of summonses and complaints, verified by defendant Star, with proof of service, claiming money judgments for alleged customer defaults. "As a matter of longstanding and systematic practice, the process serving defendants understand that the account of defendant Brand Jewelers, Inc., like that of many other major volume creditors, is one for which proper service is neither expected nor desired, and * * * the process serving defendants * * * fail to make proper service of process, or prepare * * * false * * * affidavits of service of process, or both [for Brand and the other volume creditors], knowing that such affidavits will be used to obtain default judgments * * *." Brand Jewelers obtains default judgments for failure to appear and file a timely answer against over 90% of the defendants named in its aforesaid summonses and complaints, "and such default judgments are thereafter enforced against such persons by garnishment of their wages and other means." Most of these judgments "are invalid in that, among other things, they are based upon [false] affidavits of service * * * without proper service of process having been made."

In somewhat more "mixed" allegations, the complaint goes on to aver that the above-described practices of defendants in obtaining default judgments "violate the Constitution and laws of the United States, impede and burden the United States in the exercise of its powers and the discharge of its responsibilities, and create a public nuisance of direct concern to the United States," in that (a) many victims of default judgments are deprived of property without due process of law; (b) affidavits denying that defendants are in military service are made without knowledge of the facts, violating the Soldiers' and Sailors' Relief Act, 50 U.S.C. App. § 520; (c) garnishments of wages and other practices of defendants "impose a substantial burden on interstate commerce, and hinder the proper operation of federal bankruptcy law;" (d) federal revenue collections are "jeopardize[d]" because false default judgments are used to support improper bad debt deductions; (e) the default judgments are entitled to full faith and credit in states other than New York; (f) notices of default are sent through the United States mails; "(g) defendants' practices undermine public confidence in the courts and in the rule of law * * *;" (h) these "practices arise from and in turn exacerbate urgent contemporary problems of poverty, urban disorder and race relations—problems that the United States

1. "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States * * *."

is actively seeking to alleviate and resolve through programs involving the expenditure of federal funds and by other means;" and "(i) defendants' practices jeopardize the purposes for which the Constitution of the United States was ordained and established * * * as set forth in the preamble * * *.'"

In addition to seeking injunctive relief, the complaint prays for invalidation of default judgments unlawfully obtained, an accounting for sums realized upon such judgments, written notice of the judgment herein from Brand Jewelers to each alleged victim of an unlawful default judgment, and "restitution or compensatory or punitive damages, or both, and costs, including attorneys' fees, to any judgment debtor who appears herein within 120 days after receiving such written notice and establishes a right to such relief against defendants, or any of them."

## II.

Within the somewhat exuberant array of grounds and "interests" asserted by the Government as bases for its standing—including those in the preamble to the Constitution, the theory about bad debt deductions, the concern for the mails, and the business about full faith and credit—two points emerge, in this court's view, as sufficient to sustain the suit:

(1) the authority to remove large-scale burdens upon interstate commerce, and

(2) the authority to correct widespread deprivations, by what amounts to state action, of the right not to be deprived of property without due process of law.

The two are not necessarily distinct and separate. Indeed, their doctrinal bases are substantially identical. The order of listing them here reflects only the degree of their narrow, and probably non-essential, resemblance to authoritative decisions of the past.

(1) The starting point is In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L. Ed. 1092 (1895), the subsequent history of which illustrates the spectacular unpredictability of the evolution of precedents. There, it will be recalled, the United States obtained an injunction against continuation of a strike and boycott, attended by acts of physical obstruction, affecting the operations of 22 railroads (presumably capable of mounting their own lawsuits). In sustaining sentences for contempt for defiance of the injunction, the Supreme Court upheld the right of the United States, by its Attorney General and his subordinates, to sue for injunctive relief where interstate commerce and "the carriage of the mails" were being "forcibly obstructed" (*id.* at 577, 15 S.Ct. 900, 903) in the manner shown. "Among the powers expressly given to the national government," the Court explained (p. 579, 15 S.Ct. at p. 904), "are the control of interstate commerce and the creation and management of a post office system for the nation." (The cited powers of the "national government" are, of course, among those given *to Congress* in Article I of the Constitution.) The Court went on to recall some of the manifold statutes in which Congress had exercised those powers—by authorizing compensated transportation by railroad of government personnel and property and the mails, by regulating transportation of livestock, by regulating labor-management relations, by the general regulations given for administration to the ICC, and by erecting and regulating the post office system. *Id.* at 579–580, 15 S.Ct. 900. The Court mentioned the familiar rule that a State may not "legislate in such a manner as to obstruct interstate commerce." *Id.* at 581, 15 S. Ct. at 905. It went on to ask rhetorically (*id.*):

"If a state with its recognized powers of sovereignty, is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that state has a power which the state itself does not possess?"

From the powers of Congress over commerce and the mails, the Court said, "it follows that the national government may prevent any unlawful and forcible interference therewith." *Id.* This could be done by criminal proscriptions. *Id.* It could be done by force. *Id.* at 582, 15 S.Ct. 900. But it could also, and not least desirably, be done by "appeal in an orderly way to the courts for a judicial determination, and an exercise of their powers by writ of injunction and otherwise * * *." *Id.* at 582–583, 15 S.Ct. at 905.

As for the supposed need of a property interest to justify the role of the United States as plaintiff, the Court said this would be satisfied because "the United States have a property in the mails * * *." *Id.* at 583, 15 S.Ct. at 906. But the Court went on to specify that the decision was not rested "upon this ground alone." *Id.* at 584, 15 S.Ct. 900. It said (*id.*):

"* * * Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is [*sic*] often of itself sufficient to give it a standing in court."

The Court reviewed and explicated its decisions in United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L. Ed. 747 (1888), and United States v. Bell Telephone Company, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888). In re Debs, 158 U.S. at 584–586, 15 S.Ct. 900, 39 L.Ed. 1092. It extracted their general principles (*id.* at 586, 15 S.Ct. at 907):

"It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties."

The Court found further support for its decision in the precedents establishing the right of public officers to sue for abatement of public nuisances. *Id.* at 586–589, 15 S.Ct. 900. Expanding this thought later on, the Court said *id.* at 592–593, 15 S.Ct. at 909):

"The difference between a public nuisance and a private nuisance is that the one affects the people at large and the other simply the individual. The quality of the wrong is the same, and the jurisdiction of the courts over them rests upon the same principles and goes to the same extent. Of course, circumstances may exist in one case, which do not in another, to induce the court to interfere or to refuse to interfere by injunction; but the jurisdiction—the power to interfere—exists in all cases of nuisance. True, many more suits are brought by individuals than by the public to enjoin nuisances, but there are two reasons for this: First, the instances are more numerous of private than of public nuisances; and, second, often that which is in fact a public nuisance is restrained at the suit of a private individual, whose right to relief arises be-

cause of a special injury resulting therefrom." [2]

The principles of *Debs* have had repeated and fairly direct application in other situations where the United States has sued to remove burdens or obstructions affecting commerce—although it may be that some of the people and underlying interests favored in such cases would have caused amiably ironic reactions in Mr. Debs and his fellow contemnors. Thus, the Attorney General has been held entitled to sue in the name of the United States, with no special statutory authorization, to relieve the burdens upon commerce caused by racial segregation in interstate travel facilities, United States v. City of Jackson, 318 F.2d 1, 9, 11, 14–17 (5th Cir.1963), rehearing denied, 320 F.2d 870 (1963); [3] United States v. City of Shreveport, 210 F.Supp. 36, 37 (W.D.La.1962); United States v. Lassiter, 203 F.Supp. 20, 24 (W.D.La.) (3-judge court), aff'd per curiam, 371 U.S. 10, 83 S.Ct. 21, 9 L. Ed.2d 47 (1962); United States v. City of Montgomery, 201 F.Supp. 590, 594 (M.D.Ala.1962), or other forms of racially motivated interference, United States v. United States Klans, 194 F. Supp. 897, 902 (M.D.Ala.1961). See also United States by Katzenbach v. Original Knights of the Ku Klux Klan, 250 F.Supp. 330, 356 (E.D.La.1965) (3-judge court); United States v. State of Mississippi, 229 F.Supp. 925, 976 (S.D. Miss.1964) (3-judge court, Brown, J., dissenting), rev'd, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). Similarly, the Attorney General may sue, without a statute that says so, to enjoin unlawful actions obstructing navigable waters, Sanitary District of Chicago v. United States, 266 U.S. 405, 425–426, 45 S.Ct. 176, 69 L.Ed. 352 (1925), and to enjoin improper changes in collective agreements where the changes would create a "threat of obstructing interstate commerce," Florida East Coast Railway Company v. United States, 348 F.2d 682, 685 (5th Cir.1965).

Closely similar is the right of the United States to sue to enjoin unauthorized carriage of passengers for hire in the national parks—because, apart from any property right, the "national policy [under statutes and administrative regulations, not any direct constitutional prescription] is involved of protecting the public in traveling within the park, and in such a case, injunction is the proper remedy." Robbins v. United States, 284 F. 39, 46 (8th Cir.1922), citing *Debs*.

Slightly farther removed from *Debs* —but only in incidental fact, not in essential principle—is the right of the United States to sue to protect servicemen from taxes barred by Federal law, because "the interest of the national government in the proper implementation of its [statutory] policies and programs involving the national defense is such as to vest in it the non-statutory right to maintain [the] action." United States v. Arlington County, 326 F.2d 929, 932–933 (4th Cir.1964); see also Sullivan v. United States, 395 U.S. 169, 170 n. 2, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969).

Seeking to bring this suit within the literal ambit of *Debs* and its progeny, the Government claims that the practices it assails—"long-standing and systematic," duplicating similar conduct "of many other major volume creditors"—

---

2. In United States v. San Jacinto Tin Co., *supra*, the Court had laid emphasis upon a cognate conception. While it recognized the right of the Attorney General to sue for cancellation of a land patent fraudulently procured, it pointed out that the right would not exist if the suit had "actually been brought for the benefit of some third person, and * * * no obligation to the general public exist[ed] which require[d] the United States to bring it * * *." 125 U.S. at 286, 8 S.Ct. at 857. See also United States v. Bell Telephone Co., *supra*, 128 U.S. at 367, 9 S.Ct. 90.

3. The cited opinion of Judge Wisdom was limited by his brethren's disclaimers so as to express in large part his views alone. The point is one to be noted, of course. The citation remains weighty for the cogency of the opinion and the distinction of its author.

create burdens upon and obstructions of interstate commerce. The court observes that there are factual differences between this case and the cited precedents, but none warranting a different result on the point now in issue.

The complaint alleges that "defendants' practices, including the garnishment of wages pursuant to default judgments * * *, impose a substantial burden on interstate commerce * * *." That is a broad assertion. It may remain to be demonstrated. Some part of the demonstration may have been supplied already in the Government's brief, which cites evidences of the losses of employment from garnishments, burdens upon employers, disruptions of labor-management relationships—much of which is reflected in a statutory finding by the Congress in the Consumer Credit Protection Act of 1968, § 301, 15 U.S.C. § 1671(a) (2) (Supp. V, 1970).[4] However that may be, the sufficient point for now is that the court has only a Rule 12 motion. Perhaps the simplest and most accurate thing to say is that the allegedly substantial burden upon interstate commerce must be assumed in this setting to be real. Defendants acknowledge that this approach is appropriate for motions asserting failure to state a claim for relief, but argue it is otherwise for a motion that questions "standing." No plausible reason appears for the distinction, and the court rejects it. The most defendants may fairly claim is a right to establish upon a record that the alleged burden upon commerce does not really exist, cf. Morgan v. Virginia, 328 U.S. 373, 377–378, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946), and even that is at least debatable, cf. id. at 391, 66 S.Ct. 1050 (dissenting opinion). There is no solid ground for the view that the Government's allegations may be brushed aside as presumptively false on this motion to dismiss.

Moving onward, defendants would distinguish this case from Debs and the others because the burden and interference here are not palpably "physical" like the alleged force and violence of the railroad strikers. But no persuasive reason is offered, and the court perceives none, for building a constitutional distinction upon these supposed differences. The roots of Debs, as reflected in the authorities it cited, extend from the fundamental powers and obligations of the United States, through its Attorney General, "to protect the public" in areas of national right and authority. See United States v. Bell Telephone Co., supra, 128 U.S. at 367–368, 90 S.Ct. 90, 32 L.Ed. 450; United States v. San Jacinto Tin Co., supra, 125 U.S. at 285–287, 8 S.Ct. 850, 31 L.Ed. 747. In these two cases the alleged wrongs (assertedly invalid patents) on which the United States sued were not more "physical" than the ones here. And these in turn are not less physical than the asserted affronts to "policies and programs involving the national defense" which gave "the non-statutory right to maintain [the] action" in United States v. Arlington County, supra, 326 F.2d at 932–933. The short of this subject is that "[a] non-forcible obstruction may be just as serious an invasion of the Federal Government's constitutional powers as a strike or mob action * * *." United States v. City of Jackson, supra, 318 F. 2d at 15.

The contrast defendants also propose between "direct" and "indirect" burdens or obstructions is not more helpful to them at this stage. It may well be that effects on commerce that were fanciful, attenuated or far removed from the alleged wrong would be unavailing to warrant application of the Debs doctrine. Conceivably an evidentiary record in this case could show such a state of affairs. But we have now the allegation of a "substantial burden," echoing a fresh Congressional finding to the same effect, and that seems ample for the purposes in hand.

4. "The application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, and the resulting disruption of employment, production, and consumption constitutes a substantial burden on interstate commerce."

The gist of *Debs*, after all, was not railroads or physical facts or "directness" for its own sake, but an obstruction of broad impact, sufficient in its dimensions to be thought "public" rather than "private", causing or threatening injury of such moment as to bring fairly into play the National Government's "powers and duties to be exercised and discharged for the general welfare * * *." 158 U.S. at 584, 15 S.Ct. at 906. On the allegations before this court, these fundamental criteria are met.

The factual differences from *Debs* urged by defendants serve only as reminders of what has been said many times, in the *Debs* opinion among other places (*id.* at 591, 15 S.Ct. at 909):

> "Constitutional provisions do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation."

In *Debs*, the paralysis of some railroads, centered in Chicago, presented the "special exigency * * * which demanded that the court should do all that courts can do * * *." *Id.* at 592, 15 S.Ct. at 909. Finding such urgencies in the Government's complaint, the Court saw no "need [to] turn to the public history of the day, which only reaffirm[ed] with clearest emphasis all its allegations." *Id.* Here, we find in the complaint charges of impositions upon ghetto dwellers, burdening them and commerce, exacerbating "urgent contemporary problems of poverty, urban disorder and race relations"—and we have no need to decide how far judges should or may look at (or contrive not to see) the different public history of what goes on now, in Chicago and elsewhere.

Defendants warn that the power claimed by the Government in this case is "overwhelming" and "awesome"[5]—a power that "can readily become a terrible engine of oppression."[6] This is a little hyperbolic to describe the peaceable submission of the United States that it should be permitted to sue in court and pray for judgment on behalf of thousands of people alleged to have been cheated in ways that deny their constitutional rights and burden the nation's commerce. At the same time, defendants have a point when they urge that it is no small matter for anyone to have the resources of the Federal Government drawn up against him in a lawsuit. In the end, however, the potential of imaginable horrors is not a pointedly useful test. Possible abuses by the Attorney General are subject to the control of Congress. See United States v. San Jacinto Tin Co., *supra*, 125 U.S. 273 at 284, 8 S.Ct. 850, 31 L.Ed. 747. Still more immediately, the whole matter is in court, where the Attorney General submits for judicial judgment all questions of propriety, possible excess, scope and limit.

In sum, then, for reasons above sketched, the court finds the complaint sufficient on its face to give standing to the United States because of the character and extent of the alleged wrongs as burdens upon interstate commerce.

(2) For essentially similar reasons, the court holds alternatively that the United States may maintain this action because it has standing to sue to end widespread deprivations (i. e., deprivations affecting many people) of property through "state action" without due process of law.

It seems not to be disputed—and the court holds in any event—that the alleged conduct here of those licensed to serve process, and to authenticate by official seal and notarial license that service has been duly and lawfully made, amounts to "state action" in the relevant sense. Cf. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961). There is authority for the standing of the United States here in the opinions of notable jurists. See United States v. State of Mississippi,

---

5. Memorandum in support of motion, p. 17.

6. Reply memorandum, p. 5.

229 F.Supp. 925, 976 (S.D.Miss.1964) (dissent of Judge Brown), rev'd, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); United States v. City of Jackson, Mississippi, 318 F.2d 1, 9, 14, 17 (5th Cir. 1963).[7] But the question must be acknowledged to be open. Having recorded that acknowledgment, this court finds no acceptable basis in principle for distinguishing today the authority of the Attorney General to protect against large-scale burdens on interstate commerce from his authority to protect against large-scale denials of due process. The dramatic history of how great judges participated in the building of a nation by imaginative unfolding of the commerce power needs no retelling here. Nor is it necessary now to be portentous about the new struggles for individual rights and decency that may be vital for the preservation of what our predecessors built. It seems sufficient for present purposes to say that there appears to be no pertinent constitutional difference between the national power to regulate commerce and the prohibition in the Fourteenth Amendment which the United States seeks in this suit to enforce.

It is said that Congress has on occasion given to the Attorney General power to sue for enforcement of individual rights, but has declined to grant by statute the standing now claimed: *expressio unius*, as the saying runs, *est exclusio alterius*. But the range and effectiveness of that canon are in general somewhat limited. It was available, *mutatis mutandis*, in *Debs* and other cases in the line. Cf. United States v. Bell Telephone Co., *supra*, 128 U.S. 315 at 334, 336, 371–373, 9 S.Ct. 90, 32 L.Ed. 450.

The failure of Congress to take positive action, sometimes a matter of moment, is hardly the equivalent of a negation. It seems especially dubious to fashion a prohibition from Congressional inaction in a case like this one, where both Congress and the courts are conceded by the executive to have veto powers, on the issue of standing as well as on the merits.

### III.

Less interesting topics are presented by defendants' alternative prayers for a more definite statement and for the striking of portions of the complaint. Neither of these branches warrants favorable action at this time. The objectives sought are more appropriate for handling in discovery and in the formulation of a pretrial order. The denial of relief at this time is without prejudice to contentions of a similar nature that defendants may present in such later stages.

The motions to dismiss and for other relief are in all respects denied. Despite the decisive style of decision-writing in our system, it may be evident that the ground asserted for dismissal presents "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation * * *." This acknowledgment by this court in the quoted language of 28 U.S.C. § 1292(b), with the acquiescence of the Government, makes the case a proper one for appeal under that provision, subject, of course, to the controlling discretion of the Court of Appeals.

It is so ordered.

7. There are opinions to the contrary. United States v. Biloxi Municipal School District, 219 F.Supp. 691, 693–694 (S.D. Miss.1963), and United States v. Madison County Board of Education, 219 F. Supp. 60, 61 (N.D.Ala.1963), both aff'd on other grounds, 326 F.2d 237 (5th Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). See also United States v. County School Board of Prince George County, 221 F.Supp. 93, 103–104 (E.D.Va.1963).