563 F.2d 1121
 UNITED STATES of America, Appellant,
v.
Dr. Neil SOLOMON, Secretary of Health and Mental Hygiene of
the State of Maryland, Bert W. Schmickel, Director, Mental
Retardation Administration, Department of Health and Mental
Hygiene of the State of Maryland, and Dr. Marvin M.
Malcotti, Superintendent, Rosewood State Hospital, Appellees,
The National Association for Retarded Citizens, et al., The
State of Texas, The State of Connecticut,
Commonwealth of Pennsylvania, Amicus Curiae.
 No. 76-2184.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 5, 1977.
Decided Oct. 12, 1977.
 
 Frank D. Allen, Jr., Atty., U. S. Dept. of Justice, Washington, D.C. (Jervis S. Finney, U.S. Atty., Baltimore, Md., J. Stanley Pottinger, Asst. Atty. Gen., and Brian K. Landsberg, Atty., U. S. Dept. of Justice, Washington, D.C., on brief), for appellant.
 Paul Walter, Asst. Atty. Gen. of Maryland, Baltimore, Md. (Francis B. Burch, Atty. Gen. of Maryland, Judith K. Sykes and Stephen J. Sfekas, Asst. Attys. Gen. of Maryland, Baltimore, Md., on brief), for appellees.
 John L. Hill, Atty. Gen. of Texas, David M. Kendall, Jr., First Asst. Atty. Gen., Thomas W. Choate, Sp. Asst. Atty. Gen., Richel Rivers, Asst. Atty. Gen. of Texas, Austin, Tex., on brief for Amicus Curiae, State of Texas.
 Jeffrey Cooper and Norman J. Watkins, Deputy Attys. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Chief, Civ. Litigation, Robert P. Kane, Atty. Gen., Com. of Pennsylvania, and Carl R. Ajello, Atty. Gen., State of Connecticut, for Amicus Curiae.
 Before WINTER, BUTZNER and HALL, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The question we must decide is whether the Attorney General of the United States, without specific statutory authorization, has the right to bring suit on behalf of the United States against three state officials, responsible for the operation of a state hospital for the confinement and treatment of mentally retarded persons, to redress the alleged deprivation of Eighth, Thirteenth and Fourteenth Amendment rights of the patients. The district court concluded that he did not and it dismissed the complaint. We agree, and we therefore affirm.
 
 I.
 
 2
 The dismissed complaint alleges that Rosewood State Hospital, located at Owings Mills, Maryland, was established and is operated by officials of the State of Maryland for the purpose of providing treatment and care to mentally retarded persons. Approximately 2,400 persons are patients at Rosewood, and many are committed there and involuntarily confined. About one-half of the patients are younger than twenty-one, and about one-half of the patients are classified as severely or profoundly mentally retarded. It is asserted that, notwithstanding that all, or nearly all, mentally retarded patients at Rosewood are capable of benefitting from treatment and rehabilitative care, defendants, who are charged with responsibility for the operation of Rosewood, have failed or refused to provide treatment and rehabilitative care to patients in a number of respects. It is also asserted that, in a number of respects, defendants have failed or refused to provide Rosewood patients with decent and humane living conditions and to keep them free from harm. As a consequence, it is alleged that the rights of these patients under the Eighth, Thirteenth and Fourteenth Amendments are being infringed.
 
 
 3
 In a submission made to the district court to supplement the complaint, it is asserted that Rosewood receives substantial amounts of federal funds. For example, in 1975 it received in excess of $5.6 million from the Department of Health, Education and Welfare, mostly as payments under the Medicare Program, in excess of $12,000 from the Department of Defense for providing rehabilitative treatment for military dependents entitled to military health care, and a smaller amount from the Department of Agriculture. Similar payments, in comparable amounts, were made from each of these sources for 1974 and 1973, and some funds from still other federal sources are received.
 
 
 4
 The complaint alleges that the United States has a direct concern in the proper treatment, habilitation, and rights of mentally retarded patients at Rosewood by virtue of a Presidential Statement on Mental Retardation (November 16, 1971), as well as §§ 1905(c) & (d) of Title XIX of the Social Security Act (42 U.S.C. §§ 1396d(c) & (d)), the Education of the Handicapped Act (20 U.S.C. §§ 1401 et seq.), and the Developmental Disabilities Services and Facilities Construction Act (42 U.S.C. §§ 2661-2666 and 2670-2677c) (as now amended by the Developmentally Disabled Assistance and Bill of Rights Act, P.L. 94-103, 89 Stat. 486, 42 U.S.C. §§ 6001-6012 (1977)).[1]
 
 
 5
 The United States sought equitable relief against continuation of the claimed deprivations, asserting it to be the only adequate means of preventing the unconstitutional practices being committed by defendants. The district court, however, dismissed the complaint on the grounds that the United States lacked the authority and standing to bring the suit.
 
 II.
 
 6
 It is too late in the day to deny that in a proper case the protections of the Eighth, Thirteenth and Fourteenth Amendments extend to the mentally retarded who are involuntarily confined. See, e. g., Wyatt v. Aderholt, 503 F.2d 1305, 1316 (5 Cir. 1974). Similarly, we have no doubt that if the United States had authority to bring the suit, the Attorney General of the United States is the one to act as its counsel. The provisions of 28 U.S.C. §§ 516-519 require this conclusion because the language of § 516 could hardly be clearer: "Except as otherwise authorized by law, the conduct of litigation in which the United States . . . is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."[2] But this statute does not decide this case. It is merely a housekeeping provision. United States v. Daniel, Urbahn, Seelyle and Fuller,357 F.Supp. 853, 857-58 (N.D.Ill.1973); Allen v. School Bd. of Prince Edward City, 28 F.R.D. 358 (E.D.Va.1961). As said in Daniel, Urbahn, Seelyle and Fuller, "(Section 516) does not explicitly provide that officers of the Department of Justice may conduct any litigation in which they believe the government has any interest; it merely provides that if any is conducted, it shall be done by the Department of Justice." 357 F.Supp. at 858.
 
 III.
 
 7
 Thus, the question presented by this case, as we see it, is whether the United States or the Attorney General had authority to sue to redress the alleged deprivations of the patients' rights. The answer to the question is to be found in a consideration of the statutes on which the government relies and a determination of whether they explicitly authorize the suit, and, if they do not, a consideration of the scope and application of the judicially created doctrine of permitting a suit by the United States, despite lack of statutory authorization, in certain areas in which the United States has an interest.
 
 
 8
 In the instant case, while the United States points to numerous examples of federal legislation evidencing federal interest, concern and action with respect to the mentally retarded, it points to no statute which explicitly authorizes the bringing of this suit. The closest that the government comes to citing a statute granting authority to sue is in its discussion of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6010 et seq., but even then the United States relies not on the statute but on its legislative history. The statute, § 6010, enacts a bill of rights for persons with developmental disabilities; that is, a statement of minimum objectives and standards for their treatment, services and habilitation which is made binding on both the federal government and the states. In the legislative history of this Act, the statement is made that the rights of such persons should be protected and assured by Congress and the courts. Conf.Rep. No. 94-473, 94th Cong., 1st Sess. 42; (1975) U.S.Code Cong. & Admin.News 919, 961.[3]
 
 
 9
 The Act is legislation to provide grants in aid to the states. A grant is given to a state if the state submits a plan complying with the statutory and administrative requirements set forth in §§ 6011 and 6012. Included in these are the requirements of § 6012(a) that the state "will have in effect a system to protect . . . the rights of persons with developmental disabilities" and that the system will "have the authority to pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons . . .." Once a grant has been given to a state, the Act imposes no continuing duty on the United States to see to its proper application. Indeed, § 6003 particularly states that, except as specifically provided otherwise, "nothing contained in this chapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance or operation" of any facility such as Rosewood.
 
 
 10
 Thus, we do not think that the Act is capable of a reading that explicitly gives the United States the right to institute this suit. The language in the conference committee report referring to the right to resort to a judicial forum for the protection of the right to treatment manifestly refers to a state judicial forum and not to a federal judicial forum where the United States customarily sues.
 
 
 11
 Nor do we find implicit authority in any of the legislation on which the government relies to authorize it to sue.[4] We have no doubt that the United States has an interest, in the generic sense, in the subject matter of the suit, and that it has an interest, in the generic sense, in seeing that the various funds which it pays to Rosewood are properly expended. We note that the suit is not one against the State of Maryland to enforce the condition of a grant or for breach of a contract pursuant to which a grant was made. Where we differ from the government's conception of the issue before us is that we view the case as one of a question of authority and not simply of interest. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), discussed infra. Express or implicit statutory authority to sue simply does not exist.
 
 IV.
 
 12
 Since we find no statute which expressly or impliedly authorizes the filing of this suit, we consider whether the case is one within the line of authorities permitting the United States to sue even when not authorized by statute.
 
 
 13
 The historical development of the doctrine is well summarized in P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System, 1301-09 (1972), and Note, Nonstatutory Executive Authority to Bring Suit, 85 Harv.L.Rev. 1566 (1972). Succinctly stated, it can be said that it was early established that, without benefit of statute, the United States could bring suit on a contract to which it was a party or to protect or vindicate a right to property which it owned. See, e. g., Dugan v. United States, 16 U.S. (3 Wheat.) 172, 4 L.Ed. 362 (1818); United States v. Tingey, 30 U.S. (5 Pet.) 115, 8 L.Ed. 66 (1831); Cotton v. United States, 52 U.S. (11 How.) 229, 13 L.Ed. 675 (1850); Jessup v. United States, 106 U.S. 147, 1 S.Ct. 74, 27 L.Ed. 85 (1882). Its right to sue as guardian of the Indian tribes and to vindicate the rights of its Indian wards is established. See, e. g., Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); United States v. Board of Comm'rs of Osage County, 251 U.S. 128, 40 S.Ct. 100, 64 L.Ed. 184 (1919).
 
 
 14
 Recognition of the right to sue to protect the public, as distinguished from its own property interests or those of the persons for which it was guardian, occurred in United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888) (patent to land allegedly procured by fraud), and United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888) (letters patent to an invention allegedly fraudulently obtained).
 
 
 15
 The real expansion in the doctrine permitting the United States to sue without specific authorization occurred in In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). That case arose out of the Pullman strike of 1894. It was an application for a writ of habeas corpus questioning the validity of an injunction for violation of which the petitioner was held in contempt and committed. The injunction had been granted in a suit to enjoin the strike in which the district court's jurisdictional base was alleged to be a conspiracy to obstruct the carriage of the mails and processes of interstate transportation in violation of the Sherman Act. Although in sustaining the district court's assertion of jurisdiction the Court could well have relied on established doctrines, the Court stated its preference to place its decision on broader grounds:
 
 
 16
 Summing up our conclusions, we hold that the government of the United States is one having jurisdiction over every foot of soil within its territory, and acting directly upon each citizen; that while it is a government of enumerated powers, it has within the limits of those powers all the attributes of sovereignty; that to it is committed power over interstate commerce and the transmission of the mail; that the powers thus conferred upon the national government are not dormant, but have been assumed and put into practical exercise by the legislation of Congress; that in the exercise of those powers it is competent for the nation to remove all obstructions upon highways, natural or artificial, to the passage of interstate commerce or the carrying of the mail; that while it may be competent for the government (through the executive branch and in the use of the entire executive power of the nation) to forcibly remove all such obstructions, it is equally within its competency to appeal to the civil courts for an inquiry and determination as to the existence and character of any alleged obstructions, and if such are found to exist, or threaten to occur, to invoke the powers of those courts to remove or restrain such obstructions; that the jurisdiction of courts to interfere in such matters by injunction is one recognized from ancient times and by indubitable authority; . . .. 158 U.S. at 599, 15 S.Ct. at 912.
 
 
 17
 The exact contours of Debs are difficult to fathom and they have received differing interpretations in the decided cases. If Debs is given its most expansive possible meaning, the executive may sue without statutory authorization whenever the alleged violations "affect the public at large." 158 U.S. at 586, 15 S.Ct. 900. One court has come close to this reading. United States v. Brand Jewelers, Inc., 318 F.Supp. 1293 (S.D.N.Y.1970), and the Brand Jewelers' court treated our decision in United States v. Arlington County, 326 F.2d 929 (4 Cir. 1964) as supporting this result. Other courts, however, have treated Debs as depending upon one or more of the particular elements of the facts on which it was decided, e. g., a situation of national emergency, a case where Congress had exercised the constitutional power which was impugned by the action sought to be redressed, the harm was a public nuisance, and there was a statute authorizing suit on which the decision could have been grounded. Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925), is not authority for a broad reading of Debs. While it permitted the United States, without specific statutory authorization, to sue to enjoin the operation of a municipal sewage system endangering navigation on the Great Lakes, the Debs elements of commerce and nuisance were both present and there were both a treaty and a federal statute defining the interests to be protected.
 
 
 18
 Except for Brand Jewelers, no court has interpreted Debs as broadly as we are asked to do in the instant case. In this circuit we have held that the United States may sue to effect recovery of federal funds improperly disbursed. Wilson Clinic & Hospital, Inc. v. Blue Cross of South Carolina, 494 F.2d 50 (4 Cir. 1974). We have held that the United States may sue to enforce immunity of the armed forces to certain state taxes in accordance with a congressionally authorized program relating to national defense. United States v. Arlington County, 326 F.2d 929 (4 Cir. 1964). In United States v. Marchetti, 466 F.2d 1309 (4 Cir. 1972), cert. denied, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), we held that the interest of the United States in national security where it had contractual rights to protect that interest permitted it to sue without explicit authority.[5] In all of these cases, the United States had a property interest to be protected or there was a well-defined statutory interest of the public at large to be protected. In United States v. Guy W. Capps, Inc., 204 F.2d 655 (4 Cir. 1953), aff'd on other grounds, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955), we held that the United States could not maintain an action for breach of a trade agreement setting import quotas in the absence of express authorization by Congress and when the agreement was in violation of a statute dealing with the matter to which it was related.
 
 
 19
 The instant case is one in the field of civil rights and in this area nonstatutory authority on the part of the government to sue has been upheld in cases where the government sought to desegregate public facilities on the ground that segregated facilities constituted an obstruction to the flow of interstate commerce and Congress has exercised its power to outlaw such conduct. United States v. Original Knights of the Ku Klux Klan, 250 F.Supp. 330 (E.D.La.1965) (alternative holding); United States v. City of Shreveport, 210 F.Supp. 36 (W.D.La.1962) (alternative holding), aff'd, 316 F.2d 928 (5 Cir. 1963); United States v. Lassiter, 203 F.Supp. 20 (W.D.La.) (alternative holding), aff'd per curiam, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962); United States v. City of Montgomery, 201 F.Supp. 590 (M.D.Ala.1962); United States v. U. S. Klans, 194 F.Supp. 897 (M.D.Ala.1961); Cf. United States v. City of Jackson, 318 F.2d 1 (5 Cir.), rehearing denied, 320 F.2d 870 (5 Cir. 1963). See also United States v. Bibb County Executive Committee, 222 F.Supp. 493 (M.D.Ga.1962) (segregated voting facilities); United States v. State of Mississippi, 229 F.Supp. 925 (S.D.Miss.1964) (three-judge court) (Brown, J., dissenting), rev'd, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965).
 
 
 20
 Where, however, there was no basis on which to claim that interstate commerce was obstructed by a denial of civil rights in violation of some congressional enactment, four courts have held that the government lacks nonstatutory authority to sue. United States v. County School Board of Prince George County, 221 F.Supp. 93 (E.D.Va.1963); United States v. Biloxi Municipal School District, 219 F.Supp. 691 (S.D.Miss.1963), and United States v. Madison County Board of Education, 219 F.Supp. 60 (N.D.Ala.1963), both affirmed on other grounds, 326 F.2d 237 (5 Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964); United States v. School District of Ferndale, 406 F.Supp. 1122 (E.D.Mich.1975). See also United States v. Mattson, CV 74-138-BU (D.Mont.1976) (holding same relying on district court opinion in this case).
 
 
 21
 We consider United States v. Brand Jewelers, Inc., 318 F.Supp. 1293 (S.D.N.Y.1971), which has been criticized in 84 Harv.L.Rev. 1930 (1971); 37 Brooklyn L.Rev. 426 (1971); 17 Wayne L.Rev. 1287 (1971). It held that the United States has nonstatutory authority to sue in a case where there was a claim of an obstruction to commerce generally but no claim of violation of any statute enacted to protect commerce, and, alternatively, a claim of denial of due process of law. In Brand Jewelers, the principal defendant was engaged in the retail sale of jewelry mostly on credit. It was alleged that debtors were deprived of their property without due process of law by defendant's practice of obtaining judgments for customer defaults in payments without proper service of suit papers and by false affidavits of service. On motion to dismiss, the nonstatutory right of the government to sue was sustained because of its allegation that Brand Jewelers' business scheme that of retail sales on credit, the fraudulent obtention of judgments for unpaid balances and the subsequent garnishment of wages constituted a burden on interstate commerce and that it constituted a denial of due process of law. Giving Debs an extreme reading, the Court reasoned that since the United States had authority to remove substantial burdens on interstate commerce and to correct deprivations of property without due process of law, albeit both unexercised in the areas of Brand Jewelers' practices, the government could sue.
 
 
 22
 We decline to follow Brand Jewelers and we decline to hold that in the absence of specific authority the United States may sue in the instant case. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) the so-called "Steel Seizure Case" is one of the reasons for our decision. It raised the question of whether the President had the authority to seize the nation's steel industry in an effort to prevent a crippling steel strike during the Korean War. Because the President had no statutory or constitutional authority to seize the mills, the Court held that the seizure was illegal and improper.
 
 
 23
 The case is important here because of the light that it sheds on the doctrine of separation of powers. It stressed that the concept forbade the conclusion that the President acted properly, because to sustain his action would be to permit him to make law since he did not otherwise have the authority to act and that, in turn, would violate the provision of the Constitution assigning legislative powers to the Congress. Mr. Justice Jackson, while he concurred in the Court's opinion, also wrote a separate concurrence and he, too, stressed that when the executive acts in an area in which he has neither explicit nor implicit statutory authority, "what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 638, 72 S.Ct. at 871.
 
 
 24
 In the instant case, if we were to read Debs to authorize this suit, we would not only permit the executive to take action for which we have concluded he is neither explicitly nor impliedly authorized to take, we would also authorize the executive to do what Congress has repeatedly declined to authorize him to do. See n. 4, supra. Moreover, we would do so in an area where considerations of federalism and comity are also present. Although the instant case is a suit against certain officials of Rosewood, its effect on the State of Maryland is manifest. Congressional concern with federal-state relations in the area of civil rights is sufficiently great that we are reluctant to sustain nonstatutory executive acts in all but the clearest case.
 
 
 25
 In addition, there is in this case no factor of interstate commerce. Nor can it be said that, as abhorrent as maltreatment of the mentally deficient would be if proved, the immediate victims constitute "the public at large," or that the situation constitutes a national emergency.
 
 
 26
 For all of these reasons, therefore, we do not think that Debs may be relied on to sustain the present suit.
 
 
 27
 AFFIRMED.
 
 BUTZNER, Circuit Judge, concurring:
 
 28
 I concur specially to emphasize that this case has been decided on narrow grounds. The government brought suit to enjoin the violation of rights secured to present and prospective mentally retarded patients of Rosewood State Hospital by the eighth, thirteenth, and fourteenth amendments. I agree that this suit "is not one against the State of Maryland to enforce the condition of a grant or for breach of a contract pursuant to which a grant was made." P. ----.
 
 
 29
 Evidence proffered by the government shows that between 1973 and 1975 Rosewood received more than $14 million in federal grants designed to aid the mentally retarded. To secure these funds the state was required to comply with the constitutional provisions, laws, and regulations governing their disbursal. If the government had brought suit to enforce the conditions of the grants or for breach of contract, quite a different question might well have been presented. It has long been recognized that the United States has implied authority to sue for vindication of its proprietary and contractual interests in grants that it has made. United States v. San Jacinto Tin Co., 125 U.S. 273, 279-85, 72 S.Ct. 863, 96 L.Ed. 1153 (1888) (land grant); United States v. Bell Telephone Co., 128 U.S. 315, 356-73, 9 S.Ct. 90, 32 L.Ed. 450 (1888) (patent); United States v. San Francisco, 310 U.S. 16, 29-30, 60 S.Ct. 749, 84 L.Ed. 1050 (1940) (land grant); United States v. County School Board of Prince George County, Va., 221 F.Supp. 93, 103 (E.D.Va.1963) (educational impact funds); United States v. Frazer, 297 F.Supp. 319, 322-24 (M.D.Ala.1968), 317 F.Supp. 1079, 1082-84 (M.D.Ala.1970) (grant-in-aid programs).
 
 
 
 [1]
 In its brief in this court, the United States makes reference to additional legislation evidencing congressional action with respect to the field of mental retardation, viz: 7 U.S.C. § 1431 (surplus food for various institutions, including hospitals for mentally disabled persons); 42 U.S.C. § 1761 (school lunch programs for institutionalized children); and 20 U.S.C. § 1401 (education for handicapped children). Attention is called also to the regulations of HEW, 45 C.F.R. §§ 249.12 and 249.13, establishing standards relating to the treatment of beneficiaries of Medicare and Medicare programs, which were adopted pursuant to 42 U.S.C. § 1396d(c) and (d)
 
 
 [2]
 The Reviser's Notes to § 516 state that "(t)he words 'Except as otherwise authorized by law are added to provide for existing and future exceptions (e. g., section 1037 of title 10)." In the instant case, no party claims that anyone is authorized to bring suit except through the Attorney General
 
 
 [3]
 The pertinent language of the report follows:
 The conference substitute contains a compromise which enumerates Congressional findings respecting the rights of persons with developmental disabilities. These include findings that the developmentally disabled have a right to appropriate treatment, services and habilitation; that such treatment, services and habilitation should be designed to maximize the developmental potential of the person and be provided in the setting that is least restrictive to his personal liberty; that the Federal government and the States have an obligation to assure that public funds are not provided in programs which do not provide appropriate treatment, services and habilitation or do not meet minimum standards respecting diet, medical and dental services, use of restraints, visiting hours and compliance with fire and safety codes; and that programs for the developmentally disabled should meet appropriate standards including standards adjusted for the size of the institutions which are at least comparable to those promulgated under title 19 of the Social Security Act. These rights are generally included in the conference substitute in recognition by the conferees that the developmentally disabled, particularly those who have the misfortune to require institutionalization, have a right to receive appropriate treatment for the conditions for which they are institutionalized, and that this right should be protected and assured by the Congress and the courts. (Emphasis added.)
 
 
 [4]
 It is significant that several attempts extending over a period of twenty years to enact legislation empowering the Attorney General to bring the type of action represented by the instant case have failed of enactment. In regard to the Civil Rights Act of 1957, see Letter of Herbert Brownell, Jr., Attorney General, to the Speaker of the House, H.R. 291, 85th Cong., 1st Sess., (1957) U.S.Code Cong. & Admin.News 1966, 1978-80. In regard to the Civil Rights Act of 1960, see H.R. 956, 86th Cong., 2d Sess., (1960) U.S.Code Cong. & Admin.News 1925, 1953-54. In regard to the Civil Rights Act of 1964, see H.R. 914, 88th Cong., 2d Sess., (1964) U.S.Code Cong. & Admin.News 2355, 2392, 2450
 Even when there is no legislative history to show that during this period Congress considered granting authority sufficiently broad to authorize suit in the instant case, it nevertheless extended the Attorney General's authority to sue. Thus, the Voting Rights Act of 1965 contains authority for the Attorney General to sue for injunctive relief to prevent enforcement of the poll tax. 42 U.S.C. § 1973h(c). See 42 U.S.C. § 1973j; 42 U.S.C. § 1973a. But see H.Rep. No. 439, 89th Cong., 1st Sess. (additional views of John Lindsay); (1965) U.S.Code Cong. & Admin.News at 2483-84, and 111 Cong.Rec. 16263-16265 (1965) (rejecting amendment allowing suits to enjoin interference with first amendment rights). Other authorizations are contained in the Voting Rights Act Amendments of 1970 (42 U.S.C. § 1973aa-2, § 1973bb-2), the Equal Employment Opportunity Act of 1972 (adding 42 U.S.C. § 2000e-5(f), but transferring other functions to EEOC, 42 U.S.C. §§ 2000e-6(c), (d), (e)), and the Voting Rights Act Amendments of 1975 (Attorney General's authority extended to include suits with regard to Spanish-speaking citizens).
 Finally, we note that there are presently pending in the current Congress S. 1393 and H.R. 2439, 95th Cong., 1st Sess., legislative authorization for suits like the instant case.
 
 
 [5]
 In New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), suit was predicated upon the assertion that it was necessary for the United States to sue to protect national security and foreign relations. Unlike Marchetti, there was no claim that the United States had contractual rights which it was allegedly protecting. Since the New York Times conceded the government's right to sue, the issue was not litigated. The opinions of the several justices, however, disclosed an awareness and concern with regard to the government's right to sue