UNITED STATES of America, Plaintiff-Appellant,

v.

Robert MATTSON et al., Defendants-Appellees.

No. 76–3568.

United States Court of Appeals, Ninth Circuit.

July 17, 1979.

---

Thomas A. Olson, U. S. Atty., Butte, Mont., J. Stanley Pottinger, Asst. Atty. Gen., Washington, D. C., on brief; Franco D. Allen, Jr., Dept. of Justice, Civil Rights Div., Washington, D. C., for plaintiff-appellant.

W. William Leaphart, Leaphart Law Firm, Helena, Mont., for defendants-appellees.

Before WRIGHT and ANDERSON, Circuit Judges, and TAKASUGI, District Judge.*

TAKASUGI, District Judge.

In the case before us, the Attorney General, representing the United States, seeks injunctive relief based on the deprivation of constitutional rights guaranteed by the eighth, thirteenth, and fourteenth amendments. It has been alleged that mentally retarded individuals, confined in a facility established by the state of Montana, live in an unsanitary and unsafe environment which results in injuries and deaths. Problems with understaffing and overcrowding have led to inadequate medical care and unproductive habilitative treatment.

▬▬▬ It is unquestioned that protecting the constitutional rights of the mentally retarded has become a concern of national importance, and that the courts, when appropriate, can exercise their powers to protect those rights. *Wyatt v. Aderholt*, 503 F.2d 1305, 1316 (5th Cir. 1974). Institution of the suit represents a laudable effort on the part of the United States to ensure that those needing special care and treatment receive it. If nothing more need be considered, the allegations of inhumane conditions would compel us to hear this case.

But we must also be concerned with fulfilling basic procedural requirements within the court system as well as maintaining a viable separation of powers between the branches of government so that one does not intrude unnecessarily into the sphere of another. In view of these considerations, and not on the merits of the case, we find that the United States may not bring suit to protect the constitutional rights of the mentally retarded without express statutory approval, and, accordingly, affirm the district court's dismissal of the complaint.

We rely in part on *United States v. Solomon*, 419 F.Supp. 358 (D.Md.1976), a decision involving allegations similar to those in the present suit. This well-reasoned opinion was adopted by the Montana district court in this case, and later affirmed by the Fourth Circuit in *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977). We are in substantial agreement with the reasoning of those two opinions, but feel that some of the issues merit further discussion.

▬▬▬ A fundamental judicial rule requires that a complainant establish standing before a suit can be properly heard. Such a determination can be easily made with specific statutory authority. None has been cited in this case, however, that can be read to explicitly confer standing.[1]

---

* The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

1. The United States argues that it may bring suit to protect these rights under 28 U.S.C. § 516 which provides:

Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

As noted in *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977), § 516 serves merely as a housekeeping provision which authorizes the Attorney General to bring an action where there is independent statutory authority.

The government also asserts that 42 U.S.C. §§ 1983 and 1985, which provide a civil remedy for individual constitutional rights violations, and 18 U.S.C. §§ 241 and 242 which allow the executive branch to bring criminal prosecutions for systematic deprivation of constitutional rights, establish the requisite interest. As mentioned later in this opinion, Congress has repeatedly refused to allow executive branch enforcement of the civil provisions. But there appears to be no obstacle to their assertion by individual patients or their guardians.

As for the criminal provisions, aside from the difficulty of showing intent, 18 U.S.C. § 245 states:

(a)(1) Nothing in this section shall be construed as . . . depriving State and local law enforcement authorities of responsibility for prosecuting acts that may be violations . . . . . No prosecution of any offense . . shall be undertaken by the United States except upon the certification in writing . . that . . . a prosecution . . . is in the public interest . . . . .

This provision clearly suggests that the states have primary responsibility to enforce the prosecution of constitutional rights violations.

■ Even if there is no express provision, the government can sue if it has some interest that can be construed to warrant an implicit grant of authority.[2] This doctrine, which has its roots in the late 1800's when legislative provisions were less prolific, has developed haphazardly, and clarification of its parameters has not been adequately made.

As the doctrine was shaped by each succeeding decision, the presence of certain factors emerged in suits brought without express statutory authority. Initially, the courts recognized the government's right to sue to enforce its property interests. *Dugan v. United States*, 16 U.S. (3 Wheat.) 172, 4 L.Ed. 362 (1818); *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 8 L.Ed. 66 (1831); *Cotton v. United States*, 52 U.S. (11 How.) 229, 13 L.Ed. 675 (1850).

Later cases allowed the Attorney General to institute actions so certain legislative schemes that provided no enforcement provisions could be effectuated. In *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 286, 8 S.Ct. 850, 857, 31 L.Ed. 747 (1888), the Court delineated the limits of nonstatutory authority by precluding suit:

> if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited  .  .  .; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstance.

In *United States v. American Bell Telephone Co.*, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), the Court dispensed with the pecuniary interest requirement and allowed the Attorney General to sue because of the government's obligation to protect the public from fraudulent patents.

A few years later, the Court expanded the doctrine to include cases in which a comprehensive legislative scheme was not apparent. *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). In the place of a legislative scheme, the Court implied that because the facts suggested a burden on interstate commerce, the authority rested on the commerce clause as well as the need to protect the public at large.

Where interference with national security has been at issue, courts have also relied on the doctrine to reach the merits of the controversy. *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972) (protection of contractual rights in addition to national security interest); *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (no allegation of additional factors).

Courts have also allowed tentative and much criticized forays into the area of civil rights violations based on a nonstatutory grant of authority. *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963); *United States v. Brand Jewelers, Inc.*, 318 F.Supp. 1293 (S.D.N.Y.1970). These cases have also included the need to relieve a burden on interstate commerce caused by the violation of some congressional enactment. Where that additional factor was not present, the courts have found that the government lacks standing. *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977); *United States v. School District of Ferndale*, 400 F.Supp. 1122 (E.D.Mich.1975); *But see United States v. Brand Jewelers, Inc.*, 318 F.Supp. 1293 (S.D.N.Y.1970) (claim included an obstruction to commerce *generally*, not a violation of a specific enactment).[3]

In the present case, there has been no assertion of a property interest, interfer-

**2.** For a general analytical discussion of the doctrine, see Note, *Nonstatutory Executive Authority to Bring Suit*, 85 Harv.L.Rev. 1566 (1972).

**3.** This decision has been widely criticized as an excessively broad reading of *In re Debs*. Be-cause the decision is careful to limit nonstatutory authority to large-scale deprivations, a circumstance not presently facing us, we feel no need to comment further. *United States v. Brand Jewelers, Inc.*, 318 F.Supp. 1293, 1300 (S.D.N.Y.1970).

ence with national security or a burden on interstate commerce. Instead, a number of programs have been mentioned which the Attorney General claims establish the requisite interest.[4]

Viewed generally, the legislation does indicate a keen interest on the part of the federal government. But that interest has not extended beyond providing funds for the various programs and acting in a supervisory role. Of special note is a portion of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081,[5] § 6010 of which provides:

Congress makes the following findings respecting the rights of persons with developmental disabilities:

(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that—

(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or

(B) does not meet [certain minimum standards] . . . .

The legislature apparently did not contemplate the need for federal enforcement of the Act's provisions, since § 6012 of that same Act provides:

(a) The Secretary shall require as a condition to a State receiving an allotment . . . that the State provide the Secretary satisfactory assurances that . . . (1) the State will have in effect a system to protect and advocate the rights of persons with developmental disabilities, and (2) such system will (A) have the authority to pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State . . . .

No case has been brought to our attention that allows a nonstatutory grant of authority in an area which already has state advocacy provisions.

■ Although the government claims that because the state facility receives $1.5 million in federal funds under the Act, the integrity of federal expenditures justifies intervention,[6] the provisions themselves provide that the only power wielded by the federal government is the threat of withholding funds should the states not comply with all procedural requirements. 42 U.S.C. § 6065.

In addition to the express statutory provisions requiring the establishment of state enforcement systems, we are further persuaded by the repeated failure of Congress to authorize such suits. This inaction is apparently in line with the overall congressional policy denying the federal government broad authority to initiate an action

---

4. For example, the United States cites the Social Security Act, 42 U.S.C. § 1396d(c) and (d); the Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.*; the Agricultural Act of 1949, 7 U.S.C. § 1431; and the National School Lunch Act, 42 U.S.C. § 1761.

5. The Act was originally called the Developmentally Disabled Services and Facilities Construction Act. Provisions pertinent to this case were found at 42 U.S.C. §§ 2670–2677c. These were subsequently repealed or incorporated into 42 U.S.C. §§ 6001–6066.

6. The state of Montana contends that the United States can sue to enforce contractual rights in the absence of statutory authority. *Rex Trailer Co. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1955); *United States v. Frazer,* 297 F.Supp. 319 (N.D.Ala.1968). Coupled with the statutory provisions allowing funds to be withheld, it appears that the United States has two avenues through which to discipline states receiving federal funds.

whenever a civil rights violation is alleged.[7] Notably, in 1964, Congress rejected an amendment to the Civil Rights Acts which would have authorized the Attorney General to bring suits involving civil rights violations, including the right to apply for injunctive relief. A case involving facts like those alleged in the present suit would presumably be within its ambit. The amendment failed because "the proposal injects Federal executive authority into some areas which are not its legitimate concern and vests the Attorney General with broad discretion in matters of great political and social concern." [8]

Aside from the impact on federalism, the legislative history suggests that had the amendment been passed, certain limitations would have been placed on the power to institute actions:

> Upon receiving a complaint in a case sufficiently important to warrant his conclusion that a suit would materially further the purposes of the act, the Attorney General would have to first refer the case for voluntary settlement to an appropriate agency or permit State and local laws to be utilized, unless he should find that the aggrieved party is unable to undertake or maintain suit on his own for financial reasons or because of fear or economic or other injury. . . . [T]he measure speaks on the problem solving level with primary reliance placed on voluntary and local solutions. Only when these efforts break down would the residual right of enforcement come into play.[9]

This same emphasis on state and local solutions has been brought to fruition in 42 U.S.C. § 6012.

■ We have also evaluated the recent Supreme Court cases discussing standing in other circumstances. Determination that the standing requirement has been satisfied "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

The importance of concentrating on the complainant is fortified by the test outlined in *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) in which an "injury in fact" that is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question" must be shown. In addition, the test requires that the complainant himself be among the injured. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). This test has not been limited to private individuals and organizations, but held to include governmental units as well. *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975). As even the oldest cases indicate, these requirements cannot be evaded by an assertion of nonstatutory authority. Thus "the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter." *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285, 8 S.Ct. 850, 857, 31 L.Ed. 747 (1888).

Any lesser standard than a showing of actual injury to those who assert standing would require a court to rule on important constitutional issues in the abstract, and allow a potential abuse of the judicial process. This could distort the role of the judiciary in its relationship to the executive and legislative branches. *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1973).

---

**7.** In 1957, Congress refused to pass a bill authorizing the Attorney General to bring civil suits against the state or individuals for violations of the Civil Rights Act. H.R.Rep. No. 291, 85th Cong., 1st Sess., *reprinted in* [1957] U.S.Code Cong. & Admin.News, p. 1966.

In 1960, Congress declined to establish a federal enrollment officer to ensure compliance with voting rights legislation because the federal court system, already overburdened, would be placed in an improper judicial role. S.Rep. No. 1205, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin.News, p. 1925.

**8.** H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Admin. News, pp. 2391, 2450.

**9.** S.Rep. No. 872, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Admin.News, pp. 2355, 2356.

■ The need to protect the individual branches of government from intrusion is a task not to be taken lightly. Just as any potential abuse of the judiciary must be curbed, any attempt by the executive branch to encroach in an area properly reserved for Congress "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1958).

It is on these interwoven considerations of separation of powers and compliance with procedural requirements that we reluctantly make our decision.[10]

JUDGMENT AFFIRMED.

---

**10.** H.R. 10, 96th Cong., 1st Sess. (1979), providing the U.S. Attorney with the right to sue in federal court on behalf of persons in jails, mental facilities and other institutions, passed the House of Representatives on May 23, 1979 by a 352–62 vote, and H.R. 10 was sent to the Senate, which failed to act on a similar House-passed bill in 1978.