690 F.Supp. 1201 (1988)
UNITED STATES of America, Plaintiff,
v.
STATE OF NEW YORK; Mario M. Cuomo, Governor of the State of New York; New York; State Office of Mental Health, Richard C. Surles, Commissioner of the New York State Office of Mental Health; Patricia T. Oulton, Executive Director of the Buffalo Psychiatric Center, Defendants.
No. CIV-88-138C.
United States District Court, W.D. New York.
July 13, 1988.
Roger P. Williams, U.S. Atty., Buffalo, N.Y. (Denise E. O'Donnell, of counsel), U.S. Department of Justice, Special Litigation Section, Civil Rights Div., Washington, D.C. (Verlin Hughes, David Deutsch, of counsel), for plaintiff.
Robert Abrams, Atty. Gen. of the State of N.Y., Buffalo, N.Y. (Douglas S. Cream, of counsel), for defendants.
CURTIN, Chief Judge.
Pending is the motion of defendants to dismiss this action pursuant to Federal Rules of Civil Procedure, Rule 12(b)(1) on the ground that plaintiff lacks standing to bring the action and has failed to comply with the jurisdictional prerequisites of 42 U.S.C. § 1997b(a)(2)(B).
The complaint alleges a violation of Civil Rights of the Institutionalized Persons Act [CRIPA]. Defendants move to dismiss on the ground that plaintiff has failed to satisfy certain procedural prerequisites before commencing Litigation under this Act. Specifically, defendants state the CRIPA requires the Attorney General of the United States under section 1997b(a)(2)(B) to require the State to correct the alleged condition through informal conferences and to voluntarily remedy unacceptable conditions before suit is brought.
The complaint, alleging a violation of 42 U.S.C. § 1997b, et seq., CRIPA, alleges in general terms that the inpatients at the Buffalo Psychiatric Hospital [BPC] of the State of New York's Office of Mental Health are deprived of rights secured to them by the United States Constitution.
The facts underlying the motion are not in serious dispute and are set forth in detail in the motion brought by the Attorney General to dismiss. There, the correspondence between the State and Federal officials is set forth, as well as a record of meetings which were held between the representatives of the State and the Department of Justice [DOJ].
For the purpose of this motion, the essential facts may be summarized as follows.[1] *1202 In January, 1986, William Bradford Reynolds, Assistant Attorney General, wrote to Governor Mario M. Cuomo of New York, advising him that the DOJ intended to commence a CRIPA investigation of the BPC (Exh. A). An official of the State Office of Mental Health replied, saying that arrangements would be made for a visit to the Center (Exh. B).
Six months later, two consultants from the DOJ toured the BPC. About eight months later, in February (see Exh. C), of 1987, the Assistant Attorney General wrote to the Governor advising that the DOJ had concluded that unconstitutional conditions existed at the BPC (Exh. C). In general terms, the report criticized the BPC for seriously inadequate care, deficient medical practices, misuse of seclusion, and unsafe environmental conditions. The Assistant Attorney General proposed that the State enter into a consent decree which would require remedial measures and agreed to meet with State officials on April 15, 1988 in Albany, New York to discuss this situation. The DOJ confirmed the meeting in a letter of March 24, 1987, repeating that "a legally binding and judicially enforceable agreement" was the procedural device favored by the DOJ (Exh. D).
The day before the meeting, State counsel received a copy of the proposed consent decree (Exh. E). See Appendix A. At the meeting, State officials expressed their concern over the vagueness of the proposed decree and said that it would retain consultants to review conditions at the BPC (Ex. F).
In June, 1987 the DOJ again wrote to the State insisting that it was the DOJ's position that "a consent decree provides the best vehicle for remedying conditions at BPC" (Exh. I). In response, Paul Litwak, counsel for the Office of Mental Health of New York State, stated that he thought the matter could be settled probably through entry of a consent decree, but since information was still being gathered, he believed settlement discussions were premature (Exh. J).
In September, 1987 the State informed DOJ of its plan to make a number of substantive changes at the BPC. The State asked the DOJ to submit the plan to the DOJ's experts for review and comment, but there was no response made to that request (Exh. N). In November, 1987 the State provided DOJ with additional information concerning their plan to upgrade facilities at BPC (Exh. L). A second letter was sent by the State in November, 1987 giving further information about the State's remedial plan (Exh. O). A meeting was held on November 20, 1987, at which the information was discussed. At that meeting, the DOJ continued to insist that a consent decree be entered into.
In a December 14, 1987 letter to DOJ (Exh. P) the State pointed out that:
your continued insistence upon a consent decree as the only acceptable method of resolving this matter is very troublesome. In my opinion, it is inconsistent not only with the spirit of the CRIPA legislation, but also with the terms of the meeting held November 19 with Mr. Reynolds and his associates. I am not able at this point to commit to entering a decree; however, we are eager to continue our discussions and we do not rule out a decree as the ultimate outcome of this process. At the same time, I urge you to consider alternative forms of concluding this matter, such as a Rule 41 voluntary stipulation of dismissal which was suggested at the November 20 meeting by [New York State] Assistant Attorney General Doug Cream.
While I have tried to provide you with as much information as possible, you or your consultants may have additional questions. If so, please give me a call as soon as practicable so that we may continue these discussions.
(Exh. P).
No response was made by the DOJ until January 29, 1988. At that time, the DOJ wrote to the State stating that it continued to be amenable to discussion of a settlement, but that it remained the DOJ's "strong preference to settle this case by *1203 consent decree." That letter was signed on the same day as the complaint in this action. The certificate of the Attorney General, a prerequisite to commencement of an action under CRIPA, had been signed on January 25, 1988, four days earlier.

FACTS
This lawsuit was filed on February 5, 1988. On the same date a press release was issued by the DOJ (Exh. R). The release announced that a civil suit was filed charging the State of New York with depriving 700 residents of the BPC of their constitutional rights and adequate medical care and treatment. The news report concluded that the facility had been under investigation by the Justice Department since January, 1986 and had been visited by independent experts and Civil Rights Division attorneys. It said that the Governor had been informed of the findings in February of 1987 and since that time the DOJ had sought to negotiate a consent decree to correct the alleged unconstitutional conditions to which the residents are subjected. In the press release no mention was made of the additions to staff and other changes at BPC which have been reflected in the affidavits filed by the Attorney General of the State of New York in support of its motion to dismiss.

DISCUSSION
42 U.S.C. § 1997a provides that whenever the Attorney General has reasonable cause to believe that any state is subjecting persons confined to an institution in that state to conditions which violate their constitutional rights, the Attorney General may institute a civil action to obtain a suitable remedy. However, before that action may be instituted, the Attorney General must personally certify that a number of steps have been taken.[2] As noted, the Attorney General provided such certification in the instant case. In its motion, the State does not quarrel with any of the items of certification, except for that specified by § 1997b(a)(2)(B). Under that Section, the Attorney General must certify that the DOJ has encouraged the State officials, through informal methods of conciliation and persuasion, to correct the alleged unconstitutional conditions.
The State contends that the record explicitly contradicts the certificate and for that reason may be reviewed by the court and found wanting and insufficient. Because the Attorney General has failed to comply with the certification requirements of CRIPA, the State argues that this case must be dismissed.
There are important and conflicting considerations at issue in this case. On the one hand, there is the important consideration that the mentally ill have the right to be properly cared for by the State. On the other hand, under the long tradition of federal/state division of authority, the care of mental patients has always been primarily a state function.
*1204 CRIPA was enacted in 1980 in response to several decisions in which the Attorney General of the United States was rebuffed when he attempted to sue various state institutions. In United States v. Solomon, 563 F.2d 1121 (4th Cir.1977), the United States Attorney General attempted to enjoin Maryland from violating the constitutional rights of mentally retarded patients. The Court of Appeals affirmed the decision of the district court which determined that the Attorney General lacked standing to bring the action. The court found that without express statutory authority the Attorney General lacked standing to sue. The same result was reached in U.S. v. Mattson, 600 F.2d 1295 (9th Cir.1979). That court observed that there had been a repeated failure of Congress to authorize such suits. 600 F.2d at 1299.
Congress several times rejected legislation which would have allowed the Attorney General to commence such actions because "the proposal injects federal executive authority into some areas which are not his legitimate concern and vests the Attorney General with broad discretion in matters of great political and social concern."[3]
The congressional legislation which ultimately resulted was evidently the product of compromise. Many congressmen were concerned that the federal government would improperly intrude into the details of State affairs. Recognizing this, the certificate process was instituted, so that at all times the state involved would be given an opportunity to have a reasonable opportunity to negotiate and conciliate with the Department of Justice before a suit was filed. The certificate of the Attorney General would insure that this process was honored, and authorize suit in serious cases where the process did not succeed.
The United States argues that the certificate of the Attorney, certifying that the prefiling requirements of CRIPA have been met, is not subject to judicial review. The certification requirement was reviewed in United States v. Massachusetts, C.A. # 85-0632-M (D.Mass. June 5, 1985); and in United States v. Oregon, C.A. # 86-961-LE (D.Ore. April 8, 1987). In each case the challenge to the certificate was rejected. United States v. Hawaii, 564 F.Supp. 189 (D. Hawaii 1983), cited by defendant State in support of its argument, is distinguishable and is not authority in this case.
In its memorandum in support of its position, the United States extensively reviews the legislative history and the case authority in other civil rights statutes which have held that the certification authority of the Attorney General in similar circumstances is non-reviewable. Although there are differences between the wording of the statute in the CRIPA section and other civil rights statutes, this history, in concert with the case authority cited above, is persuasive that the certification in the instant case may not be reviewed by the court.
Nevertheless, the end result is distressing. From the correspondence and meeting history between the parties, it clearly appears that DOJ did not make a serious effort to mediate or conciliate regarding the remedies suggested by the State of New York. Instead, DOJ continually insisted throughout the correspondence that the consent decree favored by DOJ be entered into. A copy of the proposed consent decree is annexed as Appendix A. It is clear from reading the decree that it is vague, open-ended and unclear as to the extent of authority it grants DOJ. The State's alternative proposals did not receive a serious or detailed reply from the DOJ, despite the fact that the correspondence and history of the relationship between the parties indicates that the State made many changes in procedures and added considerably to the staff at the hospital during the prefiling period, and notified the DOJ of the improvements. Finally, when suit was filed, a press release issued on February 5, 1988 cited conditions as they may have existed 18 months earlier, but did not give any recognition to the changes and improvements made at the Center. It is clear *1205 from the record that the State repeatedly invited the DOJ to again visit the Center during the prefiling period. However, the DOJ did not visit and made no detailed suggestions in response to the State's proposals.
I also note that the consent decree favored by DOJ will be most difficult to administer. Because the conditions are stated in such general terms, many disputes will arise. Much will be left to the court to resolve. All parties, and the spirit of CRIPA, will be better served by the entry of a detailed decree which would provide the BPC with a clear specification of its obligations to its patients and the public at large.
However, as I have already concluded, although I have serious doubts about whether or not the conciliation process was addressed in an appropriate fashion by DOJ, nevertheless, because of case and legislative history, I determine that the motion of the State must be denied.
This has the unfortunate result that we must now proceed by formal discovery methods rather than by conciliation, which Congress urged as the better course. However, the court is confident that suitable and reasonable conditions of discovery may be set in place. A discovery meeting shall be held on August 3, 1988 at 9:00 a.m.
So ordered.

APPENDIX A

April 13, 1987

CONSENT DECREE

INTRODUCTION
1. On January 3, 1986, the Attorney General of the United States, by and through Assistant Attorney General Wm. Bradford Reynolds, notified Governor Cuomo of his intent to investigate alleged unconstitutional conditions of confinement at Buffalo Psychiatric Center, Buffalo, New York, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997b(a)(2).
2. Following the investigation, on February 27, 1987, the Attorney General of the United States, by and through Assistant Attorney General Wm. Bradford Reynolds, notified Governor Cuomo of the unconstitutional conditions of confinement at Buffalo Psychiatric Center, Buffalo, New York, and the minimal measures necessary to remedy these conditions, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997b(a)(1).
3. This case was filed by plaintiff on ________, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq.
4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345. Venue is appropriate pursuant to 28 U.S.C. § 1391(b).
5. The United States has standing to initiate this action pursuant to 42 U.S.C. § 1997a and has satisfied all prerequisites to the initiation of a civil action under that statute set forth in 42 U.S.C. §§ 1997a, 1997b, and 1997h.
6. The Defendants are the State of New York; the Honorable Mario M. Cuomo, Governor of the State of New York; Steven E. Katz, M.D., Commissioner of the State Department of Mental Health and Mental Hygiene; and Patricia Oulton, Executive Director of Buffalo Psychiatric Center; and are sued in their respective official capacities.
7. The Defendants have authority and responsibility for the operation of Buffalo Psychiatric Center and are officers of the Executive Branch of the State of New York.
8. The parties agree that the confinement, care and treatment of residents at Buffalo Psychiatric Center implicate rights secured and protected by the United States Constitution. The parties recognize the importance of these constitutional interests and, to avoid protracted and adversarial litigation, enter the following agreement.
9. The parties intend their agreement to insure constitutional conditions of confinement, care and treatment at Buffalo Psychiatric Center, and its provisions shall be construed in a manner consistent with, and to further, that purpose.
*1206 10. State officials do not concede any violation of law, and this agreement may not be used as evidence of liability in any other proceeding.
11. The provisions of this agreement are a fair and appropriate resolution of this case.
12. This agreement shall be applicable to and binding upon all of the parties, their officers, agents, servants, employees, assigns, and their successors, and upon those persons in concert or participation with them who receive actual notice of this agreement.

I. DEFINITIONS
A. As used in this Decree, the following definitions apply to the terms below:
1. "State": The Executive Branch of the government of the State of New York, specifically including the Governor of New York, the State Department of Mental Health and Mental Hygiene, the New York State Office of Mental Health, the administration of Buffalo Psychiatric Center, and any and all of their officials, agents, employees, or assigns, and the successors in office of such officials, agents, employees, or assigns.
2. "BPC" or "Center": Buffalo Psychiatric Center, located in Buffalo, New York.
3. "Physician": A medical doctor lawfully entitled to practice medicine.
4. "Psychiatrist": A physician (a) who is certified by or is eligible for certification by the American Board of Psychiatry and Neurology or (b) who has successfully completed an approved residency program in psychiatry and upon completion of requisite post-residency will become eligible for examination for such certification.
5. "Psychologist": A person who has attained at least a master's degree in the field of psychology.
6. "Direct care worker": Staff immediately responsible for implementing treatment and providing care to residents.
7. "Qualified professional": A person competent, whether by education, training, or experience, to make the particular decision at issue.
8. "Professional judgment": A decision, by a qualified professional, within the bounds of accepted professional opinion, practice or standards in the relevant field.
9. "PRN": A treatment modality ordered on a pro re nata or "as needed" basis.
10. "Psychotropic medication": Chemical substances used in the treatment of mental illness which exert an effect on the mind and are capable of modifying mental activity or behavior.
11. "Bodily restraints": (1) Physical or mechanical devices used to restrict the free movement of a resident or the movement or normal function of any portion of the resident's body, excluding those devices used only to provide support for the achievement of functional body position or balance, and devices used for specific medical and surgical (as distinguished from behavorial) treatment; and (2) Chemical substances used for the sole purpose of controlling the behavior of a resident, and not for treatment purposes.
a. "Seclusion": A form of bodily restraint whereby a resident is placed alone in a locked room, or a room from which the resident is physically prevented from egress.
12. "Treatment": Therapeutic steps and activities, including psychological and psychiatric services and medication, determined by qualified professionals consistent with professional judgment to be appropriate to protect a resident from unreasonable risks to personal safety and necessary to enable a resident to function free from undue bodily restraint or seclusion.

II. PURPOSES AND OBJECTIVES
A. The State of New York and the United States stipulate and agree that the purposes and objectives of this Consent Decree are to establish the following conditions at Buffalo Psychiatric Center to ensure that residents at the facility are not being deprived of rights, privileges or immunities secured to them by the Constitution of the United States:
*1207 1. Medical and psychiatric treatment must be provided to residents, sufficient to reduce or eliminate unreasonable risks of harm to their personal safety and unreasonable use of bodily restraints.
2. Adequate medical care must be afforded all residents pursuant to the exercise of professional judgment by a qualified professional.
3. Psychotropic and other medications must be prescribed and administered to residents pursuant to the exercise of professional judgment by a qualified professional.
4. Bodily restraint and seclusion procedures, when appropriate, must be administered safely and pursuant to the exercise of professional judgment by a qualified professional.
5. The physical environment of the facility shall be improved as necessary and maintained so as to ensure that it poses no unreasonable risks to the personal safety of residents.
B. These purposes and objectives shall be achieved at Buffalo Psychiatric Center by implementing the requirements set forth in Sections III, IV, and V.

III. CONDITIONS REQUIRING IMMEDIATE CORRECTION
In order to eliminate conditions which pose an immediate and unlawful threat to the life, health, and safety of residents at Buffalo Psychiatric Center, the State agrees to meet the following requirements:
A. As soon as possible, but not later than 30 days after entry of this Decree, at least three registered nurses will be on duty at Buffalo Psychiatric Center during the night shift and shall be readily available to the general population.
B. As soon as possible, but not later than 30 days after entry of this Decree, at least one licensed practical nurse will be on duty per ward during the night shift.
C. As soon as possible, but not later than 30 days after entry of this Decree, at least one physician and one psychiatrist shall be on duty at all times and shall be readily available to the general population for emergency and other care during all shifts.
D. As soon as possible, but not later than 30 days after entry of this Decree, defendants shall take all necessary steps to insure that all living units have means of temperature regulation and ventilation, sufficient to prevent or eliminate an unreasonable risk of harm to the personal health and safety of residents.
E. As soon as possible, but not later than 30 days after entry of this agreement, seclusion and restraint may be employed, when appropriate, only pursuant to the exercise of professional judgment by a qualified professional, in such a manner as to ensure the safety of the person secluded or restrained. Seclusion and bodily restraint, in general, may be used only in a manner consistent with Section V(J) of this Decree.
F. Within 30 days after entry of this Decree, defendants shall identify all residents receiving psychotropic medication, including residents who receive more than one such drug, and develop appropriate evaluation procedures designed to insure that a psychiatrist reviews the drug regimen of each resident identified. Such review shall include but not be limited to: whether the drugs prescribed for and administered to each resident are appropriate for the needs of that resident, drug side effects, drug dosage levels, and use of two or more psychotropic drugs in combination.
G. As soon as possible, but not later than 60 days after entry of this Decree, defendants shall initiate the evaluation process developed pursuant to paragraph F, above.
H. Within 90 days after entry of this Consent Decree, defendants shall complete the evaluation process developed and implemented pursuant to paragraphs F and G, above.

IV. STAFFING
A. Within six months after entry of this Decree the State shall ensure that a sufficient number of physicians, including psychiatrists, psychologists, registered nurses, licensed practical nurses, and direct care *1208 workers are employed to assure attainment and consistent maintenance of at least the ratios of such staff to residents at the Buffalo Psychiatric Center delineated in subparagraphs 1-6 below.

1. Physicians 1:75
2. Psychiatrists 1:30
3. Psychologists 1:60
4. Registered Nurses 1:25
5. Licensed Practical Nurses 1:25
6. Direct Care Workers 1:6 day and evening
 shifts
 1:8 night shift

B. At the State's discretion, the ratios may be obtained by hiring additional needed staff or by reducing the resident population of the Buffalo Psychiatric Center. The State agrees that, if it decides to reduce the population of the Center by discharging patients, the determination as to which residents shall be discharged will be made by qualified professionals.
C. By no later than six months after entry of this Decree, the State shall likewise ensure sufficient consultation or otherwise provide services at Buffalo Psychiatric Center by such medical specialists as may be needed to provide adequate routine and emergency medical care to each resident including, but not limited to, neurologists, opthalmologists, gynecologists, orthopedists, and dentists.
D. In addition to the ratios set forth above, the State shall employ, by six months after entry of this Order, and thereafter retain on the staff at Buffalo Psychiatric Center:
1. At least one psychiatrist with primary responsibility for supervising, monitoring, and coordinating all psychiatric care activities and operations at the Center, and who possesses at least the following minimum qualifications:
a. Demonstrated skills and competence in both clinical psychiatric practice and supervision of other psychiatrists and physicians in an institutional setting; and
b. Certification by the American Board of Psychiatry and Neurology;
2. The State shall ensure that the only physicians who render psychiatric care, treatment, or services to residents at the Center will be physicians qualifying as psychiatrists as defined in Section I of this Decree.
3. At least one psychologist possessing a Ph.D. in the field of psychology, who has been licensed or certified by the State, and who has primary responsibility for supervising, monitoring, and coordinating all psychological care activities and operations at the Center.
4. At least one registered nurse possessing a graduate degree in psychiatric nursing, who has primary responsibility for supervising, monitoring, and coordinating all psychiatric nursing care activities and operations at the Center.
5. At least one qualified geriatrician with primary responsibility for monitoring and coordinating the care of geriatric residents of the Center.
6. Staff-to-resident ratios set forth in this Section are intended as minimum staffing requirements, and are not to be interpreted to preclude or discourage the State from choosing, at its discretion, to employ additional staff such that the Center exceeds the staffing requirements set forth herein.

V. PLANS
In order to establish compliance with this Consent Decree, the State shall file with the Court no later than _______ its plans(s) for implementing this Consent Decree. The plan or plans filed shall specify a date or dates by which each plan shall be completely implemented but in no event shall any plan have an implementation date later than six months after entry of this Decree. Such plan(s) shall include:
A. The steps that the State will take in order to meet the staff-to-resident ratios required under the terms of this Decree. Appropriate steps may include release of residents, changes in personnel policies, hiring standards and employment practices, adjustments in salaries or pay levels, enhanced recruitment efforts and techniques or other incentives, and other measures calculated either to attract and retain qualified staff, or to reduce the resident population, or both.
*1209 B. The number and categories of staff that will be utilized to implement plans required by Paragraphs C to N, below.
C. The procedures to be implemented to ensure that professional and direct care staff are adequately supervised and that such staff exercise professional judgment through such measures as staff training.
D. The procedures (a) to be utilized to provide regular, periodic professional evaluations of each resident in order to identify those in need of treatment and/or training programs; and (b) to provide a sufficient number of treatment and/or training program hours to each resident for whom such treatment and/or training is necessary.
E. The procedures to be utilized to provide for consultation and communication of relevant information between and among personnel regarding residents' medical care, psychiatric treatment, and training needs and the communication of information regarding each resident's medical care, psychiatric treatment and training to staff who provide care for that resident.
F. Recordkeeping systems and administrative procedures with respect to each patient's medical care, psychiatric treatment, and required training that shall be utilized to maintain and make readily available in each resident's record such information as is professionally necessary to permit the exercise of professional judgment in that resident's care, medical treatment, and training.
G. The measures that will be undertaken to provide adequate medical care, including but not limited to: screening necessary to prevent infectious disease; the detection of early signs of illness and disease; the provision of adequate and timely routine and emergency care by appropriate professionals; and the evaluation of residents with physical handicaps and the specific steps that will be undertaken to provide appropriate medical and physical therapy services and adaptive equipment to prevent contractures, physical degeneration, and inappropriate body growth and deformity.
H. The policies and procedures that will govern the use of medications, particularly psychotropic drugs, including policies and procedures on the handling and storage of drugs, ongoing monitoring and review of whether the drugs prescribed for and administered to each resident are appropriate for the needs of that resident, drug side effects, drug dosage levels, use of two or more psychotropic drugs, telephone orders and PRN prescriptions, and utilization of drugs with a behavior modification program.
I. The policies and procedures that will be utilized to provide that bodily restraints, seclusion, and time out (a) are administered only pursuant to the judgment and under the supervision of a qualified professional; (b) are not to be used as punishment, in lieu of treatment or training programs prescribed by a qualified professional or for the convenience of staff; but (c) may be used, when appropriate, to control residents when they engage in isolated incidents of violence and/or dangerous behavior. Said policies and procedures shall provide that the decision to place a resident in restraints, seclusion, or time out shall be recorded promptly in the resident's records and shall be reviewed by a qualified professional at specified reasonable intervals to ensure the safety of the individual restrained or secluded and determine whether or not the continuation of such restraint, seclusion or time out is professionally justified.
J. A description of measures to assure that in all aspects of Center operations there is maintained such care as is necessary to protect residents from unreasonable risks to their personal safety and unreasonable use of bodily restraint or seclusion.
K. The procedures that will be utilized to provide that residents shall be protected from unreasonable risks of bodily harm to their personal safety by the intentional conduct of staff or other residents, including requirements to report alleged incidents of bodily harm or unreasonable risk of bodily harm. These procedures should include requirements for investigating such allegations, disciplinary rules and procedures, and sanctions to be followed upon findings *1210 of bodily harm or unreasonable risk of bodily harm. There should also be devised procedures to provide adequate staff supervision, and procedures that will be utilized to provide for sufficient grounds and other security personnel designed to protect residents from unreasonable risks of bodily harm.
L. The enforcement mechanisms to be used, including disciplinary measures and sanctions where appropriate, to provide for staff compliance with all policies, rules, and standards of job performance and behavior.
M. Procedures Buffalo Psychiatric Center will utilize to remedy environmental conditions that present unreasonable risks to the health and physical safety of residents. The procedures shall describe immediate and long term plans to remedy conditions.
N. All plans shall state in specific terms and reasonable detail the actions to be taken by the Defendants, the dates of such actions, the text of the procedures, regulations, or protocols to be promulgated and issued by the Defendants, and the name and qualifications of the professional consistent with whose professional judgment the plan has been prepared and submitted.

VI. CONSTRUCTION AND IMPLEMENTATION
In construing and implementing the terms of this Decree, the following are agreed to by the parties:
A. 1. The United States shall have sixty (60) days from receipt of any plan in which to file a response to the plan with the Court. If the United States objects to any plan or portion thereof filed by the State, State and Federal officials shall meet in a good faith effort to resolve their differences. If the State and Federal officials are unable to resolve their differences through negotiation, the adequacy of the contested portions of the proposed plan to achieve the purposes and objectives set forth in Part II of this Consent Decree shall be determined by the Court in light of the United States' objections. Defendants shall have the burden to persuade the Court that the plan is adequate under this standard.
2. If, after a plan is approved, state officials decide to modify that plan or any portion thereof, State officials shall notify the Court and the United States of the proposed modification. The United States shall have sixty (60) days from the receipt of any plan in which to file a response to the plan with the Court. If the United States objects to the modification sought, State and Federal officials shall meet in a good faith effort to resolve their differences concerning the proposed modification. If State and Federal officials are unable to resolve their differences through negotiation, the adequacy of the proposed modification to achieve the purposes and objectives set forth in Part II of this Consent Decree shall be determined by the Court. The defendants shall have the burden to persuade the Court that the modified plan is adequate under this standard.
3. Plans, including modifications of plans, to which the United States does not timely object, shall be deemed approved by the Court.
4. If the United States finds that defendants have failed to implement any of the plans described in this Decree, United States officials shall meet in a good faith effort to resolve any alleged non-compliance prior to seeking Court enforcement of any of the provisions set forth in this Decree.
B. 1. The State shall submit periodic compliance reports to the United States and the Court. The reports shall be filed quarterly, fifteen (15) days after the end of each quarter, beginning on June 1, 1987, and continue until such time as this Consent Decree is terminated.
2. The compliance reports shall describe the State's progress towards implementation and compliance with the provisions of this Consent Decree and the plan(s) submitted pursuant thereto. In addition, these reports shall for each month of each reporting period:
(a) State the average daily resident population;

*1211 (b) Translate the ratios set forth in Section IV of this Decree into numbers of staff for each category of staff referenced in Section IV and compare this number with the number of staff for each such category of staff actually employed.
3. The United States and its attorneys, consultants, and agents shall have reasonable access to the facilities, records, residents, and employees of the Buffalo Psychiatric Center upon reasonable notice to the State for the purpose of ascertaining compliance with the Decree. Such access shall continue until this Consent Decree is terminated.
4. All parties shall bear their own costs, including attorney fees.

VII. TERMINATION OF DECREE
A. The parties contemplate that the defendants shall have fully and faithfully implemented all provisions of this consent decree, and plans herein required to be submitted and approved by the Court, on or before ________.
B. The Court shall retain jurisdiction of this action for all purposes under this consent decree until the defendants shall have fully and faithfully implemented all provisions of the consent decree and plans submitted pursuant thereto and until the judgment be discharged.
C. All plans required under this decree shall be submitted for approval by the Court and, if approved, shall be issued as orders of the Court and enforceable as such. The United States shall have sixty (60) days from receipt of a plan to comment or object to the approval thereof by the Court.
D. On or after the date on which the defendants shall have fully and faithfully implemented all provisions of this consent decree and plans submitted thereto, the defendants may move that the injunctions entered herein be dissolved, the judgment discharged, jurisdiction terminated, and the case closed and dismissed with prejudice on grounds that the defendants have fully and faithfully implemented and maintained all provisions of this consent decree and plans submitted pursuant thereto.
E. Dismissal shall be granted unless, within sixty (60) days after receipt of the defendant's motion, the United States objects to the motion. If such an objection is made with particularity, the Court shall hold a hearing on the motion and the burden shall be on the United States to demonstrate that the defendants have not fully and faithfully implemented all provisions of this consent decree or any approved plan(s) or any part thereof; if objection is based upon failure to implement any plan or part thereof, the United States must further demonstrate that such plan or part thereof is essential to the achievement of one or more of the purposes and objectives set forth in Part II of this Consent Decree. If the United States fails to meet this burden, the injunctions shall be dissolved, this judgment shall be discharged, jurisdiction shall be terminated forthwith, and the case shall be closed and dismissed with prejudice.
CONSENTED TO BY THE UNDERSIGNED:
FOR THE STATE OF FOR THE UNITED
NEW YORK STATES
 OF AMERICA
 Date: Date:
---------------- --------------------
MARIO M. CUOMO WM. BRADFORD REYNOLDS
Governor Assistant Attorney General
 Civil Rights Division
 Date: Date:
--------------- --------------------
ROBERT ABRAMS SALVATORE R. MARTOCHE
Attorney General United States Attorney
 Date:
---------------
PAUL LITWAK
General Counsel
Office of Mental Health
 Date: Date:
--------------- ---------------------
STEVEN E. KATZ ARTHUR E. PEABODY,
 JR.
Commissioner Chief
State Department of Special Litigation Section
Mental Health and
Mental Hygiene
 Date: Date:
--------------- ---------------------
PATRICIA OULTON CYNTHIA L. KATZ
Executive Director Attorney
Buffalo Psychiatric Center Special Litigation Section
 Civil Rights Division
 U.S. Department of Justice
 Washington, D.C. 20530
*1212 WHEREFORE, the parties to this action having agreed to the provisions in the Consent Decree set forth above, and the Court being advised in the premises, this Consent Decree is hereby entered as the JUDGMENT of this Court.
IT IS SO ORDERED, this ____ day of _______, 1987, at Buffalo, New York.
 _______________________
 UNITED STATES
 DISTRICT JUDGE
NOTES
[1] Exhibit numbers refer to Item 5, the State of New York's Motion to Dismiss.
[2] Under CRIPA the Attorney General must certify that before he commened the action he:

1) Notified the state of the conditions depriving the residents of the targeted institution of their constitutionally protected rights. 42 U.S.C. § 1997b(a)(1)(A)
2) Notified the state of the facts supporting his conclusion that the constitutionally protected rights of the resident are being violated. 42 U.S.C. § 1997b(a)(1)(B)
3) Notified the state of the minimum measures which he believes may correct those conditions violating the constitutionally protected rights of the residents. 42 U.S.C. § 1997b(a)(1)(C)
4) Notified the state of his intention to investigate the targeted institution at least 7 days in advance of the investigation. 42 U.S.C. § 1997b(a)(2)
5) Consulted with the state's officials regarding certain assistance available from the United States to assist the state in correcting the identified unconstitutional conditions. 42 U.S.C. § 1997b(a)(2)(A)
6) Encouraged the state's officials through informal methods of conference, conciliation, and persuasion voluntarily to correct the alleged unconstitutional conditions at the targeted institution. 42 U.S.C. § 1997b(a)(2)(B)
7) Is satisfied that the state has had a reasonable time in which to correct the identified unconstitutional conditions. 42 U.S.C. § 1997b(a)(2)(C)
8) Believes that the action is of general public importance and will further the vindication of the constitutionally protected rights of the residents of the targeted institution. 42 U.S.C. § 1997b(a)(3).
Defendants' Reply Memorandum of Law, Item 18, p. 2.
[3] U.S. v. Mattson, supra, at 1300, quoting H.R. Rep. No. 914, 88th Cong.2d Sess. reprinted in [1964] U.S.Code Cong. and Admin.News, pp. 2355, 2391, 2450.